# SEUFFERLE *v*. MACFARLAND.

---

CONDEMNATION OF LAND; APPEAL; COMMISSIONERS; MARSHAL'S JURY; EXPERT WITNESSES; JUDICIAL NOTICE; NOXIOUS GASES.

1. Under D. C. Code, sec. 226 (31 Stat. at L. 1225, chap. 854), conferring general appellate jurisdiction on this court, an appeal will lie from a final order of the supreme court holding a district court of the United States, ratifying and confirming a condemnation of land for public use under chapter 15 of the Code (31 Stat. at L. 1265, chap. 854), which does not provide for an appeal. (Following *Winslow* v. *Baltimore & O. R. Co. post*, 126.

2. Under D. C. Code, chapter 15, regulating the condemnation of land for public use, the scope of action of the board of commissioners is not restricted to a mere consideration of the evidence; but includes the exercise of those powers of judgment and observation which led to their selection as fit persons for such position.

3. An appellate court will not interfere with the report of commissioners, appointed in condemnation proceedings, in order to correct the amount of damages, except in cases of gross error, showing prejudice or cor-

D. C.]                               Syllabus.

ruption. The commissioners hear the evidence and frequently make their principal evidence out of a view of the premises, and this evidence cannot be carried up so as to correct the report as being against the weight of evidence. Hence, for an error in the judgment of commissioners in arriving at the amount of damages, there can be no correction,—especially where the evidence is conflicting. Commissioners are not bound by the opinions of experts, or by the apparent weight of evidence, but may give their own conclusions.

4. It is proper to refuse to instruct a jury, summoned to assess the value of land condemned for public use, to receive expert testimony and give it weight, for such jury is not bound either by the opinions of experts or by the apparent weight of evidence, but may give its own conclusions; nor are the marshal and such a jury competent to pass upon the qualifications of a witness as an expert.

5. The court may take judicial notice of the course of nature, of the location of the falls of the Potomac near Washington, where the velocity of the current of a great river is first impeded by the tide, and of the variation between mean high tide and mean low tide at a certain point.

6. Where part of a tract of land is taken by the public for a sewer, which will empty into a river bordering on the remaining portion of the land, the landowner cannot recover damages for any depreciation in the value of his remaining land which may be caused by noxious gases and vapors coming over his land from such river, where there will be no physical invasion of the land by filth or refuse from the sewer.

7. In proceedings to assess the damage to land by a taking of a part thereof for a sewer, it is proper to refuse to instruct the jury to consider whether prospective buyers will be apprehensive that the sewer will damage such lands, and to consider the effect of such apprehension upon the value of the land; for such instruction would incite the jury to conjecture and speculation.

No. 1639.  Submitted March 9, 1906.  Decided June 13, 1906.

HEARING on an appeal by the petitioners from a judgment of the Supreme Court of the District of Columbia confirming a verdict of a jury appointed to assess damages for land condemned for a sewer, and a motion to dismiss the appeal. *Motion denied and judgment affirmed.*

The facts will be found fully stated in the opinion.

*Mr. F. Snowden Hill* for the appellant.

*Mr. Edward H. Thomas,* Corporation Counsel, and *Mr. James Francis Smith* for the appellees.

Mr. Justice McComas·delivered the opinion of the Court:

Pursuant to an act of Congress, a board of sanitary engineers appointed by the President of the United States had prepared and submitted a report on the sewerage system of the District of Columbia, and in it were detailed plans for a certain outfall sewer for the discharge of the sewage of Washington, which was recommended. Congress made appropriations to pay for lands and right of way and for other expenditures. The appellees, the commissioners of this District, accordingly instituted this proceeding to condemn such land and right of way for an outfall sewer, and, among other acquisitions, to condemn a right of way 20 feet wide and about 1,200 feet in length through the land of George J. Seufferle, the appellant, whose land is located in this district near Giesboro point on the Potomac river. Under chapter 15 of the Code of this District [31 Stat. at L. 1265, chap. 854], the appellees filed a petition in the supreme court of the District of Columbia, holding a district court of the United States, seeking to acquire by condemnation "under judicial process" certain lands in fee and a right of way 20 feet wide in certain other lands, extending from the land of the United States Hospital for the Insane as far as the point in the land of Alexander T. Grimes (one of the respondents in this proceeding), where said outfall sewer will enter the Potomac river. The appellant, one of the respondents, owned a tract containing about 188 acres, adjoining the land of Grimes, and the lands of both border on and extend to the low-water mark of the Potomac river, where the tide ebbs and flows,—the land of Grimes fronting about 850 feet and the land of the appellant about 3,400 feet on the Potomac.

When the outfall sewer leaves Grimes's land it will pass under the bed of the river to the bottom and center of its channel, 700 or 800 feet away, where its outlet will be, and the sewage of Washington city (now being discharged into that river and

into its eastern branch, and above said branch), after having passed through a strainer of 1-inch mesh and a sediment chamber, and after being skimmed, will pass through the outfall sewer and its outlet into the Potomac.

This outlet will be further down the river and distant 1,000 feet from the nearest point of appellant's land, and in the middle of the channel, where, of course, the water is deepest, in greatest volume, and where the velocity of the current is greatest. In accordance with chapter 15 of the Code, providing for condemnation of land for public use, and pursuant to appellees' petition, three commissioners were appointed to appraise the values, and these commissioners made their award, with which all parties were dissatisfied, and of such dissatisfaction the court was duly notified. Thereupon, pursuant to the Code, the marshal was directed to summon seven disinterested men as a jury of condemnation, and it appears that the court below gave the jury certain instructions, and then the jury went upon the premises to be condemned, and, after hearing the parties and certain testimony of other persons, agreed upon its written verdict, which the marshal returned to the court below, the statute providing for "a written verdict to be signed by them, or a majority of them, and attested by the marshal; who shall return the same to the court, where it shall be recorded."

The appellant filed exceptions to the verdict of the jury and made a motion that the court set the same aside and direct a new jury to be summoned. The court below overruled these motions and exceptions, and the report and verdict of the jury for the amount of damage for the right of way over the land of the appellant and the amount of damage which would result to the remainder of the appellant's land for the taking of such right of way for an outfall sewer, were finally ratified and confirmed, and the right of way so taken was condemned. From the order of the court below denying his motion for arrest of confirmation of the verdict of the jury, and from the subsequent order of the court below finally confirming said verdict, the appellant entered an appeal to this court.

Before proceeding to consider the merits of the case, we must

dispose of a motion to dismiss this appeal, which was filed, claiming that in this summary proceeding for condemnation of land this court could not review the proceeding, and the respondent below had no right of appeal in this case. This question has been decided by this court at this term, in the case of *Winslow* v. *Baltimore & O. R. Co. post,* 126, where this court held that, in a condemnation proceeding under several acts of Congress relating to said railroad and to the Union station for steam railroads in the city of Washington, by which acts a special appeal was given to the court below in proceedings for the condemnation of certain lands, this court has the power and it is its duty to review the final order of the supreme court of this District holding a district court of the United States ratifying and confirming a condemnation of lands for public use; and that such appeal is within the general appellate jurisdiction conferred upon this court by section 226 of the Code. [31 Stat. at L. 1225, chap. 854.] In accordance with that decision, we now decide that an appeal from the condemnation in this case, · a proceeding under chapter 15 of the Code, relating to the condemnation of land for public use, and not providing for an appeal, lies to this court under such general appellate jurisdiction. The motion to dismiss this appeal is overruled. We need not here repeat the reasons for this action. We refer to the decision in the *Winslow Case.*

We proceed to review this case upon such appeal. After the jury was sworn the court below, in behalf of the appellee, granted ten instructions to the jury, which we need not here consider. The respondent, Seufferle, asked the court for fifteen instructions to the jury to guide them in ascertaining and deciding the damage sustained by reason of the taking of his land for any of the objects of the petition in this case. The court gave all these instructions asked for, excepting those numbered 9, 13, and 14. The jury were instructed that the respondent was entitled to damages for the right of way taken, and to damages for interruption of drainage, if any, and to interference or obstruction thereof by the construction of said sewer, and, if such obstruction be found, damages for the effect thereof upon the

whole tract of land of the respondent. Among others the court granted the following instruction:

"8. The jury, in ascertaining and appraising the difference between the market value of each whole tract of land and appurtenances thereto (through a part of which the right of way for said outfall sewer will pass) and the market value of what will be left of the same after the taking of such right of way or land for said sewer, shall consider whether, under the plan of said outfall sewer set forth in this proceeding, and its operation in accordance with said plan, the tides and waters of the Potomac river, by their natural action, force, and flow, will carry to and deposit on any part of any such whole tract of land any of the sewage that will pass through said outfall sewer; and, if they so find, they will consider whether said sewage, when so deposited, will give forth foul, poisonous, or unhealthy odors, exhalations, gases, or vapors; and, if they so find, they will consider the effect, if any, of said sewage when so deposited, and said odors, exhalations, or vapors, upon the value of said whole tract of land and appurtenances thereto, remaining after the taking of said right of way for said sewer."

The court refused to grant the appellant's instructions numbered 9, 13, and 14, which are as follows:

"9. The jury, in ascertaining and appraising the difference between the market value of each whole tract of land and appurtenances thereto (through a part of which the right of way for said outfall sewer will pass) and the market value of what will be left of the same after the taking of such right of way or land for said sewer, shall consider whether, under the plan of said outfall sewer set forth in this proceeding, and its operation in accordance with said plan, the tides and waters of the Potomac river, by their natural action, force, and flow, will hold in suspension or solution, for a time, at or near the said whole tract of land and appurtenances thereto, any of the sewage that will pass through said outfall sewer; and, if they so find, they will further consider whether said sewage, so held, will give forth foul, poisonous, or unhealthy odors, exhalations, gases, or vapors and, if they so find, whether the air, breeze, or wind

will naturally carry the same upon or over said land and appurtenances; and, if they so find, they will consider the effect, if any, of such odors, exhalations, gases, or vapors carried as aforesaid, upon the value of said whole tract of land and appurtenances thereto, remaining after the taking of said right of way for said sewer."

"13. The jury, in ascertaining the difference between the market value of each whole tract of land and appurtenances thereto (through a part of which the right of way for said outfall sewer will pass) and the market value of what will be left of the same after the taking of said right of way or land for said sewer, shall consider whether persons who may wish to buy said remaining land and appurtenances will, in the exercise of reasonable judgment and care, be apprehensive that said sewer and operation will, under the plan thereof set forth in this proceeding, damage said remaining land and appurtenances; and, if they so find, they shall consider the effect, if any, of said apprehension upon the value of said remaining land and appurtenances.

"14. In the ascertainment of the difference between the market value of each whole tract of land (through a part of which the right of way for. said outfall sewer will pass) and the market value of what will be left of the same after the taking of said right of way or land for said sewer, if a witness qualify as an expert on the value of said land and testify as to such value, he may be asked the effect, if any, of the construction and operation of said outfall sewer upon the value of said remaining land."

The sole question here is whether or not the court below erred in refusing these instructions. Notwithstanding the exhaustive argument and brief of appellant's counsel, we are convinced, after a careful examination, that the learned court below, in granting the 12 instructions asked by the appellant, fully and completely instructed the jury, and indeed most favorably on behalf of the respondent. We do not here determine whether or not the court below committed error in granting any of these instructions.

In *Shoemaker* v. *United States,* 147 U. S. 282, 305, 37 L. ed. 170, 187, 13 Sup. Ct. Rep. 361, the Supreme Court, in considering the act authorizing the condemnation of Rock Creek park and the powers and proceedings for condemnation thereunder, made observations quite appropriate here, where chapter 15 of the Code, regulating the condemnation of land, governs this proceeding: "The scope of action of the board of commissioners was plainly, by the terms of the act and the nature of the inquiry, not restricted to a mere consideration of the evidence and allegations of the parties, but included the exercise of those powers of judgment and observation which led to their selection as fit persons for such a position."

While the board should be allowed a wide field in which to extend their investigation, yet it has never been held that they can go outside of the immediate duty before them, *viz.,* to appraise the tracts of land proposed to be taken, by receiving evidence of conjectural or speculative values, based upon anticipated effect of the proceedings under which the condemnation is had. *Kerr* v. *South Park,* 117 U. S. 379, 380, 29 L. ed. 924, 925, 6 Sup. Ct. Rep. 801.

In connection with this part of the subject, we may appropriately consider the objection made to the action of the court below in declining to review and pass upon the evidence that had been produced before the commissioners.

If, as we have said, the court below was right in refusing to restrict the commissioners to a mere consideration of the evidence adduced, then it would seem to follow that the court could not be legitimately asked, in the absence of any exceptions based upon charges of fraud, corruption, or plain mistake on the part of the appraisers, to go into a consideration of the evidence. The court cannot bring into review before it the various sources and grounds of judgment upon which the appraisers have proceeded. The attempt to do so would transfer the function of finding the values of the lands from the appraisers to the court. Such a course would have presented a much more serious allegation of error than we find in the objection as made.

The rule on this subject is so well settled that we shall con-

tent ourselves with repeating an apt quotation from Mills on Eminent Domain, 246, made in the opinion of the court below: "An appellate court will not interfere with the report of commissioners to correct the amount of damages, except in cases of gross error, showing prejudice or corruption. * * * The commissioners hear the evidence and frequently make their principal evidence out of a view of the premises, and this evidence cannot be carried up so as to correct the report as being against the weight of evidence. Hence, for an error in the judgment of commissioners in arriving at the amount of damages there can be no correction,—especially where the evidence is conflicting. Commissioners are not bound by the opinions of experts, or by the apparent weight of evidence, but may give their own conclusions."

Instruction No. 14 asked the court to anticipate the proffer of testimony before the jury. It asked the court to declare that, "if a witness qualify as an expert on the value of said land, and testify as to such value, he may be asked the effect, if any, of the construction and operation of said outfall sewer upon the value of said remaining land." The record says the appellant offered evidence tending to prove the matters and facts mentioned in the three instructions refused by the court, but the jury were told to disregard such evidence. Such an instruction concerning an expert witness might mislead the appraisers, whose functions, as the supreme court says, include their own judgment and inspection of the lands taken as well as a consideration of the evidence adduced by the parties. And, since the court cannot bring into review before it the various sources and grounds of judgment upon which the appraisers have proceeded, it would not be proper for the court below to instruct them to receive expert testimony and to give it weight in this proceeding, as the supreme court has said, they are not bound either by the opinions of experts or by the apparent weight of evidence, but may give their own conclusions. Nor could the marshal, with the jury, pass upon the qualifications of a witness as an expert to testify to the effect of the construction and operation of such outfall sewer. Plainly, they could not rightly estimate the

value of such expert's opinion of the depreciated value of the remaining land of the appellant as a deduction from his expert opinion of the probable operation of such outfall sewer in the discharge of the sewage of Washington. Though it is not in the record, the court may take judicial notice of the course of nature, of the location of the falls of the Potomac, near Washington, where the velocity of the current of a great river is first impeded by the tide, and that the variation between mean high tide and mean low tide below Giesboro point, where the mouth of the outfall sewer is to be located, is less than 3 feet. Surely it would require the opinion of an experienced trial judge to determine whether such an expert had qualified as a witness. As was said by Justice Peckham, now of the Supreme Court, in *Roberts* v. *New York Elev. R. Co.* 128 N. Y. 464, 13 L. R. A. 499, 28 N. E. 486, approved in *Baltimore Belt R. Co.* v. *Sattler,* 100 Md. 335, 59 Atl. 654, "as to what the value would have been under circumstances which never existed, he knows and can know nothing, but must form an opinion wholly speculative in its nature;" and the judgment in the latter case was reversed because "it was error to have permitted experts to give their opinions as to the fact, as well as to the exact amount of damage." *Baltimore Belt R. Co.* v. *Sattler,* 100 Md. 336, 59 Atl. 654. The learned court below committed no error in rejecting this instruction.

Under the eighth instruction, heretofore quoted, the jury were told to consider whether, under the operation of the outfall sewer, the waters of the Potomac will deposit sewage on any part of the respondent's land, and whether such sewage, so deposited, will give forth foul, poisonous, or unhealthy odors, exhalations, gases, or vapors; and the jury were told to consider the effect of such from sewage so deposited, if any, and of such odors or exhalations, if any, upon the value of the whole tract of land of the respondent remaining after the taking of the 20-foot right of way for the sewer. This was a most favorable instruction; and it appears that the jury considered this subject, and they reported that no damage would result to the remainder of the land of respondent by reason of the deposit upon its ri-

parian boundaries of such sewage. This suggests that the jury would have reported that there would be no damage to respondent's land had the court instructed them as asked in instruction No. 9, before quoted. It was asked in this instruction, No. 9, that the jury should consider whether, under the operation of the outfall sewer, in accordance with the plan, tides and waters of the river, by their natural action, force, and flow, will so hold in suspension or solution near appellant's land any of the sewage from the outfall sewer; and, if so, whether such sewage, so held, will give forth foul or unhealthy odors, exhalations, or gases; and, if so, whether the air will naturally carry the same over said land of appellant; and if so, whether the effect of such odors, exhalations, and gases, so carried will depreciate the value of the whole tract of land of the appellant.

The outfall sewer passed through Grimes's land to the bottom and center of the channel of the Potomac near the south end of Grimes's land which borders 850 feet on the river; and the appellant's land joins that of Grimes on the north and nearer the city; and the sewage of Washington, after being passed through a strainer of 1-inch mesh and a sediment chamber, and being skimmed, will pass through the outfall sewer at the bottom of the river in the middle of its channel, and, though subject to such northward impulse as for some hours the incoming tide may give it, will be carried by the current and great volume of water down the river and still further away from the land of the appellant. The effect of the skimming, and office of the 1-inch strainer, to liberate small particles more likely to be more rapidly dissolved by the water, and to prevent floating matter from stranding and polluting the shores or liberating gases or odors, appears to have been considered by the jury when they reported no damage accruing under their consideration of the eighth instruction before quoted. We may not review the grounds of judgment of the appraisers, but their finding suggests what we have said. In the case of *Re Stockport, T. & A. R. Co.* 33 L. J. Q. B. N. S. 251, the doctrine was established that the injurious affecting of the appellant's land by the use of the land taken, as distinguished from the construction of the works, is a

particular injury different in kind from that which is suffered from the rest of the work, and that by this rule the landowner gets no more than justice, even if others get less. *Lincoln* v. *Com.* 164 Mass. 376, 41 N. E. 489. And it may be conceded that a final award in a case like this is final and conclusive between the parties as to the value of the land and the damages sustained, and after such proceedings the taker of land should not be subject from time to time to an action at law by the landowner or his successor in estate to recover damages for some injury not forseen. *Van Schoick* v. *Delaware & R. Canal Co.* 20 N. J. L. 254. And that the only means of redress afforded the landowner is that given by chapter 15 of the Code, and that such mode is exclusive. Dill. Mun. Corp. 993 ; *Heiser* v. *New York.* 104 N. Y. 72, 9 N. E. 866.

The case we are here considering is quite different from *Baltimore Belt R. Co.* v. *Sattler, supra,* where smoke and vapors discharged by engines, accompanied by noise and vibrations caused by engines and trains, seriously injured the dwelling and its occupants alongside the railroad tunnel, and very different from *Baltimore & P. R. Co.* v. *Fifth Baptist Church,* 108 U. S. 317, 27 L. ed. 739, 2 Sup. Ct. Rep. 719, where the smokestacks of the engine house poured smoke into the church, and the engines greatly disturbed and annoyed the occupants of the church while at worship by their rumbling, by blowing off steam, ringing bells, sounding whistles, puffing smoke from chimneys, and spouting cinders, dust, and offensive odors upon the worshipers during religious exercises in the churches adjacent to the railroad's buildings and its operation.

In this case it is apparent from the record that the appellant's land through which the sewer will run is quite remote from the outlet of the sewer, and that the injurious gases and exhalations from which he apprehends injury to his land, if realized, will more seriously affect riparian owners further down the river than they will affect the respondent. They appear to be rather imaginary than consequential. There is no physical invasion of appellant's land. The spot of apprehended danger is far removed from his riparian boundary. The

means whereby the injury is apprehended are in the bottom of a navigable river, subject at all times to the servitude of the Federal government for regulation. The use of the Potomac of which respondent complains is sanctioned by that government. The injury respondent apprehends, if it materialize, will more directly injure commerce on the river than it will the lands of riparian owners. The Federal government, which holds this highway in trust for the public, may reasonably be expected to prevent the Potomac river near its capitol city from becoming a public nuisance. "The remedy, therefore, for a consequential injury resulting from the State's action through its agents, if there be any, must be that, and that only, which the legislature shall give. It does not exist, at common law. The decisions to which we have referred were made in view of Magna Charta and the restriction to be found in the Constitution of every State, that private property shall not be taken for public use without just compensation being made. But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the State or its agents, or give him any right of action. This is supported by an immense weight of authority. Those who are curious to see the decisions will find them collected in Cooley on Constitutional Limitations, page 542, and notes. The extremest qualification of the doctrine is to be found, perhaps, in *Pumpelly* v. *Green Bay & M. Canal Co.* 13 Wall. 166, 20 L. ed. 557, and in *Eaton* v. *Boston, C. & M. R. Co.* 51 N. H. 504, 12 Am. Rep. 147. In those cases it was held that permanent flooding of private property may be regarded as a 'taking.' In those cases there was a physical invasion of the real estate of the private owner, and a practical ouster of his possession. But in the present case there was no such invasion." *Northern Transp. Co.* v. *Chicago,* 99 U. S. 635, 641, 25 L. ed. 336, 338.

"That cannot be a nuisance, such as to give a common-law right of action, which the law authorizes. We refer to an action

at common law such as this is. A legislature may, and often does, authorize, and even direct, acts to be done which are harmful to individuals, and which without the authority would be nuisances; but in such a case, if the statute be such as the legislature has power to pass, the acts are lawful, and are not nuisances, unless the power has been exceeded. In such grants of power a right to compensation for consequential injuries caused by the authorized erections may be given to those who suffer, but then the right is a creature of the statute. It has no existence without it." *Northern Transp. Co.* v. *Chicago,* 99 U. S. 640, 25 L. ed. 337. See *Gibson* v. *United States,* 166 U. S. 269, 275, 41 L. ed. 996, 1002, 17 Sup. Ct. Rep. 578.

Such an injury as is complained of in the ninth instruction would be a mere consequential matter resulting from the exercise of the public right in Congress to utilize the bed of a navigable river, possessing a great volume of water, with a current of marked velocity, for it is well known that water is an almost universal solvent,—as the least injurious and inconvenient method for the discharge of the sewage of Washington. This is *damnum absque injuria;* it does not amount to a taking under the Constitution. The case of *Eaton* v. *Boston, C. & M. R. Co. supra,* upon which appellant's counsel so strongly relies, is characterized by the Supreme Court, along with *Pumpelly's Case,* as the extremest qualification of the doctrine. We do not feel authorized to make the great advance required by this ninth instruction. The learned court below properly refused it.

The court properly refused the thirteenth instruction. The case of *Essex* v. *Acton,* L. R. 14 App. Cas. 153, is quite different in its facts, and the excerpts from Lord Macnaghten's opinion, relied on here, are not sanctioned by the other judges, nor, taken alone, do they warrant the application to this case made by respondent's counsel, in our opinion. To pour sewage out upon the land as in that case is quite different from discharging sewage in the bottom of the Potomac. To instruct the jury, as asked in the thirteenth instruction, to consider whether persons who may wish to buy the remaining lands will be apprehensive that the sewer in its operation will damage such lands,

and then to consider and measure the effect of such apprehensions upon the value of the remaining land, would be to incite the jury to conjecture and speculation. The persons who might appear and testify that they wished to buy the remaining lands, and then proceed to depreciate them by this novel rule, ought to be objects of suspicion to the jury. It would be impossible for any jury, by any arithmetical method, to weigh the conjectures of such apprehensive persons concerning the possible operation of the sewage system, the operation of which nobody can now know. Especially would such an instruction be improper to be given to appraisers who are to inspect the land and exercise their function of judging the amount of the damage. The instructions granted permitted the respondent to bring before the jury all the facts and circumstances, and to weigh them impartially. We repeat, this instruction was properly refused.

Since we find no error in either of the matters concerning which error has been assigned, the judgment of the learned. court below must be affirmed, with costs, and it is so ordered.

*Affirmed.*