Whaley, Judge,
delivered the opinion of the court:
This case comes to this court under an act of Congress approved June 21,1926, entitled “An act for the relief of the Andrew Eadel Oyster Company ” and provides:
“ Be it enacted by the Senate cmd House of Representatives of the United States of America in Congress assembled, That the United States Court of Claims be, and it is hereby, authorized and directed to hear and determine the claim of the Andrew Eadel Oyster Company for compensation for alleged damage sustained by the said Andrew Eadel Oyster Company by reason of the destruction of certain oyster beds located in Earitan Bay, about two miles southwesterly of Old Orchard Light, by a dredge of the United States War Department, on June 19,1923.”
When this bill was before the committees of the Congress full consideration was given to the decision of the Supreme Court in the case of the Lewis Blue Point Oyster Co., 229 U.S. 82, and other decisions of the Supreme Court establishing the dominant title of the Government to the subsoil in all navigable waters for the purpose of regulating and *824 improving navigation and holding that no compensation can be legally recovered for any injury to property on the subsoil of a navigable stream or bay. See Gibson v. United States, 166 U.S. 269.
The committees also were aware of the passage of the Rivers and Harbors Appropriation Act of 1922, 42 Stat. 1038, which contained, among other items, a provision to dredge a channel in New York Harbor 30 feet deep and 200 feet wide from a point northwest off Sandy Hook to a point off Seguine Point. There was also brought to the attention of the committees the fact that spar buoys with green tops had been placed along the proposed surveyed route before actual work was begun. Notwithstanding all of these facts being known and the legal immunity of the Government fully understood, nevertheless the committees came to the conclusion that the failure on the part of the engineer officer to give actual notice was an act of negligence on the part of the Government for which the Congress assumed liability and intended to grant relief. Under the general jurisdiction of this court, actions sounding in tort are not cognizable, but the Congress can confer upon this court by an act the right to hear and determine any issue. It is quite apparent from the congressional reports that it was the plain intention of both Houses of Congress to grant to the plaintiff a cause of action in tort against the Government, and to refer the issues to this court to be tried like any other suit within the general jurisdiction of this court. The act specifically presents the main fact around which the question revolves — did the War Department dredge Raritan go over the oyster beds of the plaintiff on June 19, 1923 — and if the court finds that fact in the affirmative, then the compensation for the damages, if any, is also to be found. The intention of the Congress was to create a liability where heretofore there was no liability in this particular case. The act would be meaningless and an absurdity were any other construction to be placed upon it. The law and all but two facts were well known to the Congress and the reference was made to this court to relieve *825 Congress of the arduous duty of acting in a judicial manner in the ascertainment of these facts. The plaintiff was given a judicial forum in which to establish its case and the court the jurisdiction to hear and determine the issues. See Butler Lumber Co., 73 C.Cls. 270, and cases cited. See Report No. 332, Senate Committee on Claims, March 11, 1926, 69th Cong., 1st session; Congressional Record, Senate, March 30, 1926, p. 6582, vol. 67, part 6, 69th Congress, 1st session; Congressional Record, June 11, 1926, page 11189, House of Representatives, vol. 67, part 10, 69th Congress, 1st session.
The plaintiff is a corporation under the laws of the State of New York and is engaged in the business of raising for market and selling oysters. It was the sublessee from the State of New York of two lots, known as lots 1034 and 1038, lying in Raritan Bay,, about two miles southwesterly of Old Orchard Light and extending and covering 168.3 acres and 135.1 acres, respectively, or a combined acreage of 303.4. These leases had been issued through the Conservation Commission of the State of New York to Clarence DeHart and assigned by him to the plaintiff, and granted the right to the plaintiff to the State of New York’s title to the submerged area in that portion of Raritan Bay. Rari-tan Bay is navigable and the title of the State of New York to the bed of the bay is subservient to the paramount or dominant title of the United States over all navigable waters. The boundaries of the plaintiff’s oyster lots were marked by spar buoys plainly visible to the agents of the defendant when the proposed channel was marked by spar buoys with green tops. Before these Government buoys were placed, the plaintiff on September 27, 1922, brought from other, areas 37,000 bushels of seed oysters and planted them on the submerged soil of the bay on the area covered by its leased lot no. 1034. Beginning on May 14, 1923, and ending June 2, 1923, the plaintiff brought from other areas 18,600 bushels of seed oysters and planted them in the subsoil area covered by its leased lot 1038.

*826

*827 During tbe early part of June 1923, the survey of the-channel was completed. The channel as surveyed and platted entered plaintiff’s lots at the southeast corner of lot no.. 1088, cut across lot 1034 just within the southwest corner thereof and passed out over lot 1038. The distance from entrance to exit is less than one mile.
The foregoing map, p. 826, is reproduced from defendant’s exhibit in the case and shows the course of the channel and. the location of plaintiff’s lots:
The Raritan was a seagoing suction dredge, operated by the hydraulic process, with a sucker on each side, which drew the dredged material into the vessel’s hoppers, allowing the solid matter to settle and the free water to overflow from the sides through baffle boards. The passage of the-sucker over the surface of the bottom of the channel caused the roiling of the water but the suction prevented the stirring up of sediment to any great extent. Three inches of material in depth were taken in each traverse. The escape of the surplus water through the baffle boards carried suspended in it substantial quantities of silt which was precipitated to the bottom of adjacent areas.
Dredging of the channel was commenced at southwest Spit Buoy on June 18 and continued day and night.
The evidence of the plaintiff standing alone would not establish the fact that the dredge went over and across the lots of the plaintiff, but the defendant introduced the report of the Government’s inspector, who was on the dredge, and the log of the dredge, both of which corroborate the testimony of plaintiff’s witnesses, and establish by the preponderance of the evidence, that on June 19, 1923, the dredge-Raritan did go upon and over the lots of the plaintiff, and we have so found as a fact in our special findings of fact.. With this fact having been ascertained, the next question for consideration is the extent of the loss sustained by the plaintiff. The evidence is not clear and is very unsatisfactory as to the extent of the damage and as to the value of' the seed oysters at the time of destruction.
Immediately after the passage of the dredge over the oyster beds, the plaintiff commenced to remove the seed oysters in *828 the area over which the dredge had passed, and these operations were continued until about 10,000 bushels of young oysters had been taken out. Upon examination it was found that these oysters were destroyed by silt settling upon and smothering them. The evidence discloses that the oysters removed were in and around the area over which the dredge passed and radiated from this area. The extreme outer edge of the oyster beds was about a mile from this area. Approximately four-fifths of the seed oysters were not taken out and these seed oysters were not in the immediate area over which the dredge passed. The evidence does not disclose that these young oysters were in any way affected but the plaintiff has assumed their destruction because of the condition of the oysters actually removed. We feel that it is a fair assumption that these oysters were not destroyed because they were not in the immediate area and that as the distance from that area increased, the amount of suspended matter (silt) decreased so that a point was reached when the suspended matter no longer affected the life of the young oysters.
The plaintiff did not surrender its leases of these two oyster lots but retained possession and requested of the New York Conservation Commission a reduction of its license fee in proportion to the curtailment of the area by reason of the cutting of the channel. There is no fair market value for seed oysters, and only one instance of a sale is mentioned. The plaintiff sustained the loss of some of its seed oysters. However, the evidence only shows the destruction of about one-fifth of the total number of oysters planted. The market value of grown oysters at that time was $1.32 net per bushel. The seed oysters destroyed would have been subjected to two or three years more of growth before being marketable. Having no actual market value for seed oysters as a basis, and because of the speculative nature of the number of bushels actually destroyed and the actual value at the time of destruction, it is necessary to arrive at a fair and just amount in the manner and way a jury would come to. a verdict. Acting in the capacity of a .jury to ascertain the amount of loss, and taking all the cir *829 cumstances into consideration, we feel that the plaintiff would be fairly and justly reimbursed in the amount of $15,000.
There is no taking of private property in this case which would entitle the plaintiff to just compensation under the Constitution. The special act gives a special right and limits the remedy to the amount of damages resulting from a special act of negligence on the part of an agent of the Government for which the Congress has assumed a common-law liability in this particular instance. In other words, it is a claim founded on a special law of Congress waiving the legal immunity of the defendant and creating what was damrmm absque injuria into a cause to be damnified. The rule in such cases is that no interest is allowed. This case falls within the doctrine laid down in United States v. North American Co., 253 U.S. 330, and is to be distinguished from the power of eminent domain as was pointed out in Phelps v. United States, 274 U.S. 341.
The plaintiff is entitled to a judgment in the sum of fifteen thousand dollars.
It is so ordered.
Williams, Judge; LittletoN, Judge; and Booth, Chief Justice, concur.