UNITED STATES v. MONONGAHELA BRIDGE CO.

(District Court, W. D. Pennsylvania. January 7, 1908.)

1. CRIMINAL LAW—TRIAL—INSTRUCTIONS AS TO REASONABLE DOUBT.

In a prosecution by the United States for a misdemeanor, the failure to charge the jury as to the right of the defendant to the benefit of a reasonable doubt is not ground for a new trial, where such instruction was not requested, nor any exception taken to the omission.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1996.]

2. NAVIGABLE WATERS—OBSTRUCTION BY BRIDGES—POWER OF CONGRESS TO CONTROL AND REGULATE DELEGATION TO SECRETARY OF WAR OF AUTHORITY TO PASS ON OBSTRUCTION AND ORDER REMOVAL.

The authority given to the Secretary of War by Act March 3, 1899, c. 425, § 18, 30 Stat. p. 1153 (U. S. Comp. St. 1901, p. 3545), to order the alteration or removal of a bridge found to be an unreasonable obstruction to the navigation of any of the navigable waterways of the United States, is within the constitutional powers of Congress, and the determination of the Secretary in the due exercise of such authority that a bridge is such an obstruction is conclusive.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, § 2.]

3. EMINENT DOMAIN—BRIDGES OVER NAVIGABLE WATERS—TAKING OF PRIVATE PROPERTY—CONSTITUTIONAL LAW—RIGHT TO COMPENSATION.

A bridge over a naturally navigable stream, which has not been authorized or sanctioned by Congress, may be required to be changed so that it will not be an unreasonable obstruction to navigation without compensation first being made therefor, even though the changes required will result in a virtual destruction of the bridge, amounting to an appropriation of it within the provisions of the Constitution, which forbid the taking of private property for public use without just compensation being first made.

4. SAME—STREAM ARTIFICIALLY NAVIGABLE—REASONABLE GROUND TO APPREHEND IMPROVEMENT OF—NOTICE.

The same is true where the stream, even though not naturally navigable at the time the bridge was built, has been made navigable artificially by means of locks and dams, if from conditions existing at the time the improvement of it in this way was to be reasonably apprehended.

5. SAME—PROPERTY AFFECTED WITH A PUBLIC SERVITUDE.

In every such instance property in the bridge is subject to a servitude in favor of the public, which may be asserted by the general government, acting for the common good; and, being affected with an inherent infirmity of this kind, it cannot be said to have any value which calls for compensation when so lawfully appropriated.

6. NAVIGABLE WATERS—PROSECUTION FOR FAILURE TO ALTER BRIDGE—SUFFICIENCY OF EVIDENCE.

A verdict of guilty against a bridge company in a prosecution under Act March 3, 1899, c. 425, § 18, 30 Stat. p. 1153 (U. S. Comp. St. 1901, p. 3545), for failure to comply with an order of the Secretary of War requiring defendant to alter a bridge over the Monongahela river at Brownsville, 50 miles above Pittsburgh, *held* sustained by the evidence, where it appeared that, prior to the time the bridge was built in 1832, the river had been declared a navigable stream by the Legislatures of both Pennsylvania and Virginia, and was to a small extent then navigated at that point; that surveys looking to its improved navigation as it has since been improved had been made by both the state and federal governments, and that defendant's charter granted by the state of Pennsylvania expressly provided that the bridge to be erected should not obstruct the navigation of the river.

7. SAME—DEFENSES—AUTHORIZATION OF STRUCTURE.

It is not a defense in such a prosecution that the bridge was adopted and recognized by the executive department of the government as an integral part of the national pike and post route over which the mails were carried.

## On Rule for New Trial.

This was a criminal information under section 18 of the rivers and harbors act of March 3, 1899, c. 425, 30 Stat. 1153 (U. S. Comp. St. 1901, p. 3545), preferred by the United States Attorney for the Western District of Pennsylvania against the Monongahela Bridge Company for failure to make the changes

ordered by the Secretary of War in the bridge of the said company across the Monongahela river at Brownsville, Pa., on the ground that it was an unreasonable obstruction to navigation.

The court charged the jury as follows: "Gentlemen of the Jury: This is an important case, and the duties that you are called upon to perform in connection with it are certainly somewhat out of the ordinary. On the one hand is the general government, claiming that the defendants, in refusing to comply with the order of the Secretary of War and make the changes called for in their bridge, have brought themselves within the law, and have committed an offense against it, making them liable to punishment therefor. On the other hand, the defendant company sets up as a justification for its refusal the protection of the Constitution of the United States, claiming that the order will unjustly deprive them of their property, and that they are entitled to have compensation provided before it shall be done. The charge, as it is presented here, assumes the form of a criminal charge. It is the same as though the bridge company were under indictment, and your verdict will be guilty or not guilty. The authority of the Secretary of War to act as he has done in the premises cannot be questioned. Congress, by the Constitution of the United States, is given general authority over foreign and interstate commerce, and, in that connection, has control over such waterways of the nation as may be drawn into interstate commerce, or may be used for that purpose. Provision, therefore, has been made, that when, in the judgment of the Secretary of War, there is an obstruction to such navigable waters, after giving notice to the parties and affording them an opportunity to be heard, he may make an order requiring the removal or the change of such obstruction, specifying what changes shall be made and within what time it shall be done. All this has been pursued in this case, and the regularity of what has been done by the Secretary of War is not now open to question. It must be accepted and complied with, unless a sufficient reason has been given in the position taken by the defendants for not complying with it.

"By the slack water improvement of the Monongahela river extending above and below this bridge, it is now located on what has been adopted as a part of the navigable waters of the nation devoted to interstate commerce, and the bridge having been pronounced in this way, by due authority, to be an obstruction, that is the end of that matter. The law evidently intends that a failure to comply with any such order shall be punished in such a way that it will be for the interest of the parties to comply. A maximum fine of $5,000 is directed to be imposed; and every month that the parties may fail to meet such order constitutes a new offense. So that you would have offense upon offense and fine upon fine to such an extent that the parties would hardly be able to hold out against it. So there is no question in this case for you to decide as to whether or not this bridge is an obstruction, or whether or not the changes shall be made by which the obstruction that it now presents shall be removed. The only question which is before you is whether or not the defendants are entitled to ask that the expense of this, instead of falling upon themselves, shall be borne by the general government. And upon that, upon their right to make that demand, depends the question whether or not they are to be pronounced guilty or not guilty of this charge. The Constitution says that private property shall not be taken without just compensation, and that no one shall be deprived of his property except by due process of law.

"Let us look, then, in the consideration of this case, at the question, what would be the effect of a compliance by the bridge company with this order? There can be little doubt as to that in your minds, as it seems to me, under the evidence that has been given. By that which has been required to be done, this bridge must practically be torn down, according to the evidence of Mr. Morse, whose testimony does not seem to be controverted. The present clearance of the bridge, I believe, is about forty feet, and the requirement is that it shall be made twelve feet higher. Also that the channel span shall be about four hundred feet. Mr. Morse testifies that he has made plans and estimates, and that, according to them, the present structure would have to go—there can be no doubt about that—and a new one put up. As the matter stands, this bridge represents, according to the testimony of Capt. Lenhart,

an investment of about $65,000 or $70,000, on which they are getting a net return of some $9,000 or $10,000 a year. The old bridge has an apparent life of some twenty years yet. To make a new bridge, a steel structure, which would probably be the one adopted, according to the testimony of Mr. Morse, would cost some $112,000, including the expense of removing the old and making the changes in the abutments, and also allowing a salvage in the demolition of the old one for the timber that is in it. Now, does that amount to a taking, within the provision of the Constitution? It seems to me that if it causes a substantial or serious destruction of the property which the defendants now hold and enjoy, it does come within this provision of the Constitution. The defendants have apparently got to see $65,000 wiped out and $112,000 more put in, out of their pockets, if they are to maintain this structure as a toll bridge. It is true that the franchise which they have for taking toll would not be interfered with. They may still put up another bridge, in other words, and get toll from it. And they must, in the end, some day put up such a structure, no doubt, when this one wears out. The new bridge, also, would be up to date and would have that advantage, with all the new life that was in it. But, at the same time, taking all this, taking the net result, and especially the immediate result to these parties, if this would be a substantial loss to them, it amounts, in my judgment, to a taking within the provisions of the Constitution for which, under ordinary circumstances, compensation must be made.

"The question, then comes down to this: Whether the bridge has a right to be there, under all the circumstances that are found in the case. I have already said to you that Congress has complete control over the navigable waters of the United States. This, as it now stands and according to the improvements which have been made, is one of the navigable waters. This bridge has been found to be an obstruction, and may be ordered to be removed. All these are fundamental facts that must be accepted. And the question is, why, then, must not the defendants comply? It seems to me that I can illustrate what I desire to present to you upon this point by taking extreme cases. There can be no question, in my mind, if a person undertook to locate on what was clearly a navigable water of the United States, by putting up, for instance, a bridge which spanned it, that, unless the assent of Congress were first secured, he would do this subject to the right of Congress to come in and say that it should be removed. If this were done on a tide water creek along our sea coast, no controversy as to the right of Congress to come in in this way could arise; nor, if a bridge were located across any of our important rivers, such as the Ohio, or such as the lower reaches of the Delaware and the Susquehanna, in the eastern part of this state, or such, for instance, as the Allegheny and Monongahela right here at their confluence, now, after the improvements in navigation, which exist, have been made. On the other hand, suppose a party located a bridge upon some stream quite a way in the interior, across some inconsiderable creek or stream, with no suggestion at all about it of any possibility of a use of that stream, either in its natural condition or under any probable improvement of it—there, it seems to me, we would have the opposite case; and a party could not then be charged with intruding on a navigable water, or such as in any likelihood would ever come under the authority of Congress as a navigable waterway; and that he would be protected, if he had due authority from the state, or under any circumstances; and that he could invoke this provision of the United States Constitution for his protection. But this case, unfortunately, is not so clear as all that. It occupies a middle position. It is nearer the line. One distinguishing feature of it is, however, that the navigation of this stream, as it is now conducted, is not natural, but artificial—that is to say, in its present proportions. Congress, taking up the work that was begun under the state law, has improved the Monongahela river by the location of locks and dams, carrying slack water away into the interior of the country; extending up not only through Pennsylvania, but into the neighboring state of West Virginia. We have, therefore, here an interstate navigable stream, as it stands, and on this is this bridge which, under these conditions, has become an obstruction, according to the judgment of the Secretary of War. But Congress, by direct action, has made these conditions

—as they now exist, at least; and that gives the case a different feature from the ordinary. Can that be done on the part of Congress; either by an adoption of what had already been done under the state law, or by carrying the same improvements forward? Can that be done in that way and this property taken, in order that the work may be complete and meet all the requirements, without the parties whose property is so taken being entitled to invoke the protection of the Constitution? It seems to me, then (and I have so ruled in the course of this case), that we have got to consider what were the natural conditions of this stream, and what was reasonably to be apprehended therefrom at the time this bridge was constructed.

"Was this by nature a navigable water? Now, we have the Legislatures of both Pennsylvania and Virginia in the early days declaring that this stream was a navigable stream. That bears somewhat on the question; but, at the same time, we must have something more than a mere legislative declaration, in my judgment. And this, as you will note, was merely with regard, apparently, to matters within each of these respective states, not necessarily extending to interstate navigation, where alone Congress comes in. You have heard the testimony of these witnesses; and old historical matters have been referred to, bearing on the question as the character of the use of this stream. On the one hand, it is contended that boats and rafts passed up and down; and while it is conceded at certain seasons of the year, perhaps in very low and dry times, this may not have been done, yet, nevertheless, it is claimed that during the major part of the time this was made use of, and actually was a navigable water. On the other hand, it is contended, and testimony has been given to the effect, that this stream through a large portion of the year consisted merely—at least, near this bridge, as well as up and beyond it—of pools with intermediate riffles; that the boats that went down the river only got back by pushing, or poling, or in some cases by putting out lines and drawing up the boats by means of a windlass. Poling and pulling in this way hardly seems to me to constitute navigation. It is in one sense such; but looking at it in the broader sense, and having regard to the fact that the right of Congress to act depends upon the stream being navigable for the purposes of interstate commerce, was that such as existed here? If you find, however, that, taking these legislative declarations that have been shown to have been made with regard to this stream, this actually was what might be regarded as navigable water over which Congress, in the exercise of its authority, would have proper jurisdiction, then when the parties set up their bridge, they took subject to that condition, and they cannot complain now that it is enforced against them.

"I am prepared to go one step further, and testimony has been received upon the theory, and that is, that if, when this bridge was erected, the parties who built it had reason to apprehend that there would be such character of improvements as have actually now come about, they would also be affected with notice of that, and bound by it. Now, upon that question, we have several things upon the one side and the other. It is true that, not until 1836, was the Monongahela Navigation Company chartered, and this was some three years after this bridge had been built. Nor were there any locks and dams on the river at all until 1840 and 1841, when dams Nos. 1 and 2 were built, and not until 1844 were dams 3 and 4 constructed, by which the slack water was brought up to Brownsville. So that up to the time of and several years past the time when this bridge was erected there there was nothing but the stream in its natural condition, with these impediments in it such as have been described here, if you believe that testimony. At the same time, we have evidence that, even at that early day and before it, slack-water improvement of this river had been contemplated, and that, too, not only by the state government, but by the national government. United States engineers had, previous to this time, according to maps which were here produced and put in evidence, made a survey of this stream, looking to just such improvements as are now found upon it. We have also the fact that the lower reaches of the Monongahela river, as it approaches here to the confluence with the Allegheny and Ohio, by that very fact was brought in touch with the general navigation of the country. I do not know, at that early date, just how far up the stream

there was navigation, but I imagine that, from the very earliest here about Pittsburg and down the Ohio, there was such use of the river, and there were such river craft plying up and down and about here that the Monongahela at this lower part of it was already devoted to interstate navigation. And this bridge was only about fifty miles off. Was it then to be reasonably apprehended, under all these circumstances, that this stream, by such improvements as were so suggested, might become a highway such as it has now become? If you should find that it was actually a navigable stream, which could be put to the purposes of interstate navigation, or, further than that, if that was to be reasonably apprehended by the existing conditions, then the parties who built this bridge, when they erected it where they did, took with notice and subject to such conditions and to the control that would ultimately result therefrom by Congress, under its power to control the interstate waterways of the country.

"This case then, really comes practically down to that—to the disposition of those two questions. The first, of course, being the question whether the changes that are required upon this bridge would amount to a taking. But, if you dispose of that question in favor of the defendants, then the case depends upon this other question—whether this was a navigable stream or waterway, or whether these parties had reason, from the conditions existing there at the time or of which they were bound to take notice, to believe that it might be devoted to such a purpose as it now has been. Parties who act with notice act with their eyes open. They cannot complain if the risk that they take turns against them. And it does not matter, and we cannot be turned aside by the fact, that the loss to them may be serious. We may hesitate to so declare it, or to take such action as will put them in that position. But still, if the facts compel that result, neither you nor I must hesitate to do our duty in the premises. If these parties erected their bridge upon a navigable water, or that which they had reason to believe might ultimately become such, then they took subject to the control of the general government to declare, as the Secretary of War in this case has done, that the use is an obstruction to the improvement that is contemplated and desired for the benefit of the people of the United States. And, under those circumstances, the defendants cannot say that somebody else shall bear the brunt of it. Whatever the loss to themselves, they must comply with this order, if this condition be true, and you must pronounce them guilty on this charge. On the other hand, if you are not satisfied upon that point, if you believe that the stream was not naturally navigable for the purposes of interstate commerce, or that the artificial conditions which now exist by which this action of the Secretary of War is made necessary could not have been reasonably contemplated by anything that was apparent there or that had been going on, either on the part of the state or the general government, and that the bridge company, acting on the situation as it was presented to them, had no reasonable ground to apprehend any such result, then they would not be answerable at this time and cannot be required to obey it until just compensation has been made, if obedience would result in the destruction of their property and the serious loss to them which has been testified to. They must obey eventually. Mind you, that question is not open. That they do not, or at least they cannot, pretend to set up. This bridge must be changed, if this law stands, and I see no reason why it should not. The only question is, whether it must be at their expense. If you consider that the defense which they have made, as I have endeavored to explain it to you, is not made out, then you will pronounce them guilty. But, on the other hand, if you are not satisfied upon that point, even though the result of your verdict may apparently block the general government, you will find them not guilty. It is not often that a question of such administrative concern gets into a jury box to be passed upon. But the law has made you the arbiters of that question, and you alone can pass upon it.

"The parties have asked me to instruct you upon certain points of law. I do not find myself able to affirm any of the positions taken in the defendants' points, and therefore will refuse them without reading. I have covered some of the points on the part of the government in what I have already said to you. But, out of extra precaution, I will read those which I can affirm.

" 'First. By section 18 of the act of March 3, 1899, c. 425, 30 Stat. p. 1153 (U. S. Comp. St. 1901, p. 3545), Congress placed on the Secretary of War the duty of determining whether or not bridges over natural waterways of the United States were obstructions to the navigation of such waterways. In case he complied with the requirements of the law in regard to a hearing, and fixed a reasonable time for the completion of the prescribed alterations, his notice to alter the Monongahela Bridge, set forth in the information filed at above number and term, was a lawful notice, and the failure to alter said bridge in accordance with said order, or to move the said 'structure, if continued during the month of September, 1905, constituted the misdemeanor charged in the information ; and though the defendant originally built said Monongahela Bridge under color of authority of an act of Assembly of the state of Pennsylvania, and even though the requirements of that act of Assembly were strictly observed by said bridge company in constructing said bridge, such act of Assembly would not constitute a valid defense to the information.' Ans. 'That is a correct statement of the law.'

"The second point I refuse without reading.

" 'Third. Section 18 of the act of March 3, 1889, directs the Secretary of War to give the parties interested, to wit, the bridge owners, a reasonably opportunity to be heard, prior to issuing final notice to said bridge owners, to make the alterations deemed necessary by him in order to render the bridge under consideration not an obstruction to the free navigation of the river spanned by it. Such hearing need not be held by the Secretary of War in person ; and it is sufficient under the provisions of the act if the Secretary of War had given said owners an opportunity to be heard relative to the proposed alterations before one or more of his agents or subordinates, and the testimony or statements made at said hearing have been submitted to and considered by said Secretary of War.' Ans. 'That is a correct statement of the law.'

"I will refuse the fourth point without reading it. There is a part of that I could affirm, but I am not called upon to separate one from the other.

"The fifth and sixth points I refuse.

"Gentlemen, with these instructions, I submit the case into your hands. As I have said to you, it is merely whether the defendants are guilty or not guilty."

The defendants' points which were refused by the court were as follows:

First. That the authority conferred upon the Secretary of War by section 18 of the act of March 3, 1899, to require any bridge constructed across any navigable water of the United States, which is an unreasonable obstruction to navigation to be so altered as to render navigation reasonably free, easy, and unobstructed, applies only to bridges constructed under the authority of acts of Congress which reserved such power to Congress.

Second. The question whether the bridge was so constructed as unreasonably to interfere with the navigation of the river was to be determined by the requirements of navigation at the time when the bridge was erected, and was not made dependent upon the interest of future navigation, and Congress could not compel the alteration of such bridge then properly constructed, at the expense of the bridge owner, and without compensation, merely because it might, under the views of the Secretary of War, in the future be an unreasonable obstruction to some new and improved method of navigation.

Third. The Monongahela Bridge having been erected under a statute of the state of Pennsylvania, granting the bridge company such power, and with the acquiescence and assent of the United States government, and prior to the Congress of the United States having assumed jurisdiction over said river, it became a lawful structure, and the lawful property of the Monongahela Bridge Company, and the United States cannot deprive the bridge company of that property without due process of law, including compensation for the loss of the bridge company.

Fourth. The requirement by the Secretary of War in his order for the reconstruction of the Monongahela Bridge, which compels the removal by the Monongahela Bridge Company of the present structure and the erection of a new one, is a virtual taking of the property of the bridge by the Unit-

ed States without due process of law, and therefore in violation of the federal Constitution.

Fifth. The requirement of the Secretary of War in his order compelling the reconstruction of the bridge at the expense of the bridge company, and without compensation to the bridge company, is a virtual taking of the property for public use without just compensation, and is therefore in violation of the federal Constitution.

Sixth. From the evidence in the case the jury may find that the United States, both by its executive and legislative departments, invited, acquiesced in, and approved of the erection of the Monongahela Bridge as it now stands, and if they so find and also find that the government made it a part of the national highway, and it was used as such, the defendant cannot be compelled by the order of the Secretary of War to change the said bridge and alter the same at its own expense as is provided in said order, because that would be the taking of the private property of the defendant without due process of law, and without compensation.

Seventh. This information being based upon a noncompliance by the Monongahela Bridge Company with the order of the Secretary of War, which order it is alleged was made under the provisions of the act of Congress approved March 3, 1899, cannot be maintained, because in respect to these proceedings the provisions of said act are null and void, for the following reasons: (a) It attempts to take and destroy the private property of the Monongahela Bridge Company without due process of law, contrary to the provisions of the Constitution. (b) It undertakes to authorize the taking and the destruction of private property for public use without just compensation, contrary to the provisions of the Constitution. (c) It undertakes to unlawfully delegate to the Secretary of War of the United States Army both legislative and judicial powers, and this in contravention of the Constitution of the United States.

Eighth. The said act of Congress makes it the duty of the Secretary of War to first give the party reasonable opportunity to be heard, and to give notice to the persons or corporation owning or controlling such bridge (in this case the Monongahela Bridge Company) so to alter the same as to render navigation through or under it reasonably free and unobstructed, and in giving such notice the act requires him to specify the changes recommended by the Chief of Engineers that are required to be made, and the Secretary of War shall prescribe in each case a reasonable time in which to make such changes. Under this act the Secretary of War was required affirmatively to give to the Monongahela Bridge Company, the owner of the bridge in controversy, an opportunity to be heard by him, the Secretary of War, on the questions whether the bridge was an unreasonable obstruction to navigation, and what alterations shall be made, before he was authorized or lawfully empowered to give the notice and make the order he did to the Monongahela Bridge Company, requiring the alteration of said bridge, and it appearing affirmatively that the Secretary of War, in making the order set forth in the information, never at any time gave the Monongahela Bridge Company reasonable opportunity to be heard before him, or any hearing whatsoever, therefore the said order is not a lawful one, and this prosecution must fail.

Ninth. That under the evidence in the case it is for the jury to determine whether the Monongahela Bridge is an unreasonable obstruction to navigation of the Monongahela river.

Tenth. Conceding that Congress might by direct act declare the Monongahela Bridge an unreasonable obstruction to navigation, the United States has failed to show that Congress ever has taken any such action, or has ever disapproved of the bridge as constructed.

Eleventh. The evidence showing that Capt. Sibert, without affording the Monongahela Bridge Company an opportunity to be heard, first examined and then reported that the bridge was an unreasonable obstruction to navigation, and that the matter was then referred back to Capt. Sibert to grant the Monongahela Bridge Company a hearing, does not show such a hearing as the act of Congress provides for, and the fact that the bridge company appeared before him will not alter the case as it is not shown that the bridge company knew the fact of his previous examination and report.

Twelfth. Under all the evidence in the case the verdict must be for the defendant.

The defendants excepted to the charge of the court as follows: (1) To the refusal of the defendants' several points. (2) To the affirmance of the first and third points submitted by the government. (3) To that part of the charge in which the court instructed the jury that the validity of the act of Congress of March 3, 1899, and the authority of the Secretary of War thereunder to make the order in question, and the regularity of the proceedings in making said order, could not be questioned in this case, and that the order and notice of the Secretary of War were conclusive. (4) To that part of the charge in which the court instructed the jury that, if the jury found that at the time of the construction of defendants' bridge, the stream was actually a navigable stream for interstate purposes, or the defendants had reason to presume that it might be devoted to such purposes as it has been, then the bridge company would not be entitled to compensation, and the verdict should be guilty.

The jury having returned a verdict of guilty, the defendant moved for a new trial.

D. T. Watson and James H. Beal, for the rule.
John W. Dunkle, U. S. Atty., opposed.

ARCHBALD, District Judge* (after stating the facts as above). This is an information, under the act of Congress of March 3, 1899, § 18, 30 Stat. 1153 (U. S. Comp. St. 1901, p. 3545), against the defendant company for a refusal to make the changes ordered by the Secretary of War in its bridge across the Monongahela river at Brownsville, Pa., 50 miles above the city of Pittsburg. This bridge was built in 1832, under a charter from the state of Pennsylvania, and is located on the line of the Old National Pike, laid out by the federal government in 1807, to give better access to the then distant parts of what is now the Middle West. It closes the gap in the road made by the river, the necessities of travel before that being met by a ferry, and after its construction the ends of the road leading to the ferry were relocated, so as to connect with the approaches to the bridge, which was thus adopted and made an integral part of the thoroughfare. It was built at a cost of from $65,000 to $75,000 and is still in good preservation, and if undisturbed would probably last for 20 years more. It is a toll bridge and the net returns amount to about $10,000 a year, but the changes which have been ordered by the Secretary of War will compel the tearing down of the whole structure, with the loss of all that it represents, and the building of a new bridge (if the franchise is to be preserved) at an estimated additional expenditure of $112,000. There is a large and increasing use of the Monongahela by reason of the mineral and other developments on its upper reaches, but it is effected artificially, by means of slack-water navigation, secured by locks and dams, through which it is connected with the Ohio at Pittsburg and so brought in touch with the general interior system of waterways of the Ohio and Mississippi basins. At the time the bridge was built, while the river had been declared to be a navigable stream by the Legislatures of both of the states through which it runs, except for flat bottom boats and rafts, and in times of high water, the navigation of it was very limited, and in dry times, according to the weight of the evidence, practically none at all. Not

*Specially assigned.

until 1836, some four years after the bridge was built and in use, was the Monongahela Navigation Company incorporated, for the purpose of improving the river by the artificial means now employed, and not until 1840 or 1841 were the first dams actually built, slack water being extended up as far as Brownsville, on the lower side of the bridge, in 1844. At the same time, even before the bridge was erected, the improvement of the Monongahela by slack-water navigation was undoubtedly in contemplation, surveys to that end having been independently made by engineers of the state and of the national government. Upon this showing the jury were instructed that the right of the Secretary of War, acting under the authority conferred upon him by Congress to require the changes which had been ordered in the bridge, even though it necessitated its entire demolition, was not open to question; but that, in view of the serious results to the company, amounting to a deprivation of it of its property, it was protected by the constitutional provision that private property shall not be taken without just compensation being first made, which the company could demand before being required to comply, and should therefore be acquitted, unless the stream at the time the bridge was located upon it was in fact navigable, or the artificial improvement of it which has since been prosecuted, by which the changes in the structure of the bridge were made necessary, was reasonably to be apprehended; in either of which cases the company could not ask for compensation and should be found guilty. The jury having found a verdict in favor of the government, the question is as to the propriety of the instructions which were so given.

Preliminary to that, however, two points are raised which require brief consideration: (1) That the verdict as rendered is defective in form and inconclusive; and (2) that nothing was said to the jury as to the right of the defendant to the benefit of a reasonable doubt, to which it was entitled, the case being a criminal one. The first of these seems to have been suggested by the recent case of Pressed Steel Car Co. v. Steel Car Forge Co., 149 Fed. 182, 79 C. C. A. 130. But the two cases are very different. The difficulty there was that the jury failed to declare whether they found for the plaintiff or the defendant, simply stating that they sustained the validity of the contract sued upon and fixed the damages at a sum named. But here they say, in so many words, that they "find a verdict of guilty"; as to which it is not easy to see how anything could be more positive or certain. Nor is the other matter more serious. The obvious answer to it is that not only was there no request for an instruction as to the effect of a reasonable doubt, but that no exception was taken to the failure to give it. Had there been, it would have enabled the court to at once make the necessary correction as would have undoubtedly been done, and without that, the case being a misdemeanor, the omission must be regarded as immaterial. By the neglect to except at the time, the defendants virtually gave the court to understand that to this extent at least the charge was satisfactory, suggesting that the stress laid upon it, now that the case has gone against them, is an afterthought, if not indeed a catching at straws.

The important questions in the case are those which were first ad-

verted to; that is to say, whether the judgment of the Secretary of War, that the bridge in its present condition is an unreasonable obstruction to the free navigation of the river, is conclusive; and whether the bridge may be condemned and the company be required to change it, in the way specified, even to its entire destruction, without compensation for the property loss so sustained, simply because it is located upon a stream, not navigable as it is claimed, at the time the bridge was built, but having become so by artificial slack-water improvements, to meet the material progress of the country. But the first of these questions cannot be regarded as an open one, being foreclosed by the decision in the Union Bridge Case, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523. It is true, that there was no offer there, as there is here, to show that the bridge was not in fact an obstruction, but the principles upon which the case proceeds are inconsistent with the reception of any such evidence. The authority of Congress over bridges upon navigable waters, as it is there shown, is derived from the power given to it by the Constitution over interstate and foreign commerce, and this of necessity includes the right to determine what shall or shall not be considered unreasonably obstructive to free navigation, and to require a removal or alteration of that which is, to the extent that it is found to be so. The determination of this, as to any particular structure, might be made by direct investigation and action, as was done with regard to the bridge over the Ohio at Wheeling, which was sanctioned by Congress and made a post road (State v. Wheeling & Belmont Bridge Co., 18 How. 421, 15 L. Ed. 435), after it had been decided to be an impediment to navigation and ordered to be changed, in a suit expressly brought to determine that question. State v. Wheeling & Belmont Bridge Co., 13 How. 518, 14 L. Ed. 294. But instead of acting itself, Congress, as it is manifest, may prescribe by statute the conditions under which a bridge shall be regarded as obstructive, and commit the determination of specific cases, either to the courts, in accordance with established legal methods, or to officers of the general government, by administrative action. The latter is the course taken in the statute under discussion, in which, as it is held, Congress has not exceeded its constitutional powers. "Beyond question, if it had so elected," says Mr. Justice Harlan, in the Union Bridge Case, supra, "Congress, in some effective mode, and without previous investigation through executive officers, could have determined for itself primarily the fact whether the bridge here in question was an unreasonable obstruction to navigation, and, if it was found to be of that character, could by direct legislation have required the defendant to make such alterations of its bridge as were requisite for the protection of navigation and commerce over the waterway in question. But investigations by Congress as to each particular bridge alleged to constitute an unreasonable obstruction to free navigation and direct legislation covering each case, separately, would be impracticable in view of the vast and varied interests which require national legislation from time to time. By the statute in question Congress declared in effect that navigation should be freed from unreasonable obstructions arising from bridges of insufficient height, width of span, or other defects. It stopped, however, with this declaration of a gen-

eral rule, and imposed upon the Secretary of War the duty of ascertaining what particular cases came within the rule prescribed by Congress, as well as the duty of enforcing the rule in such cases. In performing that duty the Secretary of War will only execute the clearly expressed will of Congress, and will not in any true sense exert legislative or judicial power." The statute being thus vindicated, the action of the Secretary of War in conformity with its provisions is necessarily conclusive and binding, the same as that of Congress, for which it is a mere substitute or alternative. And the course of procedure which is there prescribed having been followed in the present instance, the right of the defendant to question or contest it cannot be countenanced. The same as in the Union Bridge Case, the subject was investigated by officers of the War Department to whom it was referred for the purpose, and after notice to the defendant, and a due hearing of all parties, a report was made to the Secretary of War, stating the facts, and recommending that certain specified changes in the bridge were necessary and should be required. This report was adopted by the Secretary, not perhaps in so many words, but equally effectually by the issuance of an order in conformity with its recommendations. It is true that this was done without any further hearing than that which had already been had before the officer charged with the investigation, who was to a certain extent committed to the necessity for the changes which were recommended. But while the Secretary of War might have heard the parties further, and no doubt would have accorded them that privilege if it had been asked for, he was not bound to do so in order to comply with the statute and make his action legal, nor can it be assumed that he did not give the matter independent consideration, because he did not. In the Union Bridge Case, it was applied for and refused, the obstruction to navigation caused by the bridge being apparently too plain for controversy. And yet the proceedings were sustained.

It is said, however, that Congress having provided for a trial by jury upon a criminal information duly preferred, the question of whether the bridge was in fact an unreasonable obstruction cannot be withdrawn from their consideration or concluded by executive action, the right to a hearing being essential, according to the form of proceedings adopted, in order to comply with the requirement for due process of law. No doubt it would have been competent for Congress to so provide, leaving it to a jury of the district, upon a trial according to the forms of the common law, to say whether, in any given case, the situation was such as to make the bridge an obstruction, but there is nothing in the act to suggest that it was ever so intended. Should Congress undertake to investigate and decide for itself whether a particular bridge was an unreasonable obstruction, it would hardly be contended, after it had passed upon the question, that it was still open, simply because the enforcement of its decision by a criminal prosecution, for a refusal to comply, was provided for. But, as pointed out above, the method given by the statute under consideration is merely an alternative. By a general enactment, Congress has delegated to the Secretary of War the duty of investigating and determining the cases in which the conditions exist that call for action, and his

decision is therefore to be treated as equally binding. A prosecution, by information, and a trial by jury, are merely the means provided for enforcing his orders, it being simply left for the jury to say, whether the statute has been followed in making them, and whether there has been a' willful failure or refusal to comply, after notice, constituting the offense made punishable by the statute. Nor is it of any significance in this connection that the lawful orders of the Secretary are spoken of, this being true of them, if they keep within the authority delegated to him, and are made after a reasonable opportunity to the parties interested to be heard in opposition thereto; nor that, in order to make out the offense, the refusal to comply must be willful, which means no more than that it is without just cause or excuse, as it must be after due notice and opportunity to do so. If, in addition to this, it is left to the jury to review the action of the Secretary, and to say by their verdict whether or not he was justified in his conclusions, his orders become merely persuasive or advisory, which the parties may safely disregard upon the chance of inducing a jury to believe that they are not well grounded. If that was the intention of Congress it is, of course, to be recognized, but it is not to be reached by any doubtful construction, and a careful reading of the statute leaves no place for it. As is there in terms enacted, the Secretary is to investigate and decide with regard to any bridge, constructed over a navigable waterway of the country, first giving the parties a reasonable opportunity to be heard, whether it is unreasonably obstructive to free navigation, on account of insufficient height, width of span, or otherwise, or whether there is difficulty in passing the draw opening or the draw span of the bridge, by rafts, steamboats, or other water craft, and thereupon, if it is, to give notice to the persons or corporation, owning or controlling such bridge, so to alter the same as to render navigation under it reasonably free, easy, and unobstructed, specifying the changes recommended by the chief of engineers that are required to be made, and prescribing a reasonable time in which to make them. All this has been observed in the case in hand, and the only alternative given by the statute is obedience, neglect or failure to comply being punishable by fine, and each month's delay being made a new offense to be similarly dealt with. There is no room to be found in any of these provisions for a re-examination by the jury of the question of the obstructive character of the bridge, which must therefore be held to have been conclusively determined thereby.

But it is said that the changes which are required to be made will virtually destroy the bridge, and thus deprive the defendant of its property, which cannot be done without at least making just compensation. Conceding that, if located upon waters which were naturally navigable, the rights of the owners would be subject to a servitude in favor of the public which would justify such action without this (Gibson v. United States, 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996; Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126; Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523), it is contended that the present structure was built at a day when the stream was not navigable, the changes which

are proposed to be now introduced being made necessary solely be-cause of the artificial character of the improvements, which is a different matter. There is evidence, contravening this, that the Mononga-hela, without regard to the slack-water improvements which have been undertaken, was a navigable water within the meaning of the law (The Montello, 20 Wall. 430, 22 L. Ed. 391), and that flowing through West Virginia and Pennsylvania as it did, and connecting at Pittsburg with the vast system of waterways of the Ohio and Mississip-pi basins, it obviously came within the class of waters over which Congress had authority. The river was also declared navigable by the Legislatures of the two states having immediate jurisdiction over it; and, in the charter granted to the bridge company by the state of Pennsylvania, it was expressly provided that the erection of the bridge should not obstruct the navigation of the river so as to interfere with the passage of rafts, steamboats, or other river craft, which of itself, as pointed out in the Union Bridge Case, where a similar provision appeared, was a warning to the company that the bridge must not ob-struct navigation as it then was or subsequently might be. This was sufficient to justify the finding of the jury, and take the case out of the constitutional provision requiring compensation to be made, as-suming that the verdict was based upon it. But the jury were also instructed that, even if not in fact navigable at the time, if the com-pany had reasonable grounds to believe that it might become so, in the way it has, the incorporators would take equally subordinate to the right of public improvement which has been exercised; or, in other words, would be subject to the same servitude as if the stream were in fact then and there navigable. There is evidence from which this could have been found, not only in the circumstances which have been alluded to, but also in the surveys which were made before the bridge was built by the engineers of both the state and the national governments, looking to the slack-water improvements which have since been carried through. And as the verdict, under the charge of the court, may have been predicated upon this view, it becomes neces-sary to consider how far the company was affected by this character of notice.

It will not of course be denied that, in every enterprise, a party is charged with notice, not only of that which is immediately in view, but of that also, which according to outward and obvious indications, is to be reasonably apprehended. This is elementary law, and there is no good reason why it should not apply in a case of this kind the same as any other. It amounts to no more than that every one is bound to observe the situation as it is, and take subject to the conse-quences reasonably to be expected from that which is thus brought home to him. As already stated, where a bridge or other structure is located upon waters which are naturally navigable, except as it has been sanctioned by Congress, it is affected with all the infirmities in-cident to or consequent upon that position. This is not confined to conditions as they are at the time, or else Congress would not be able to provide for the future needs of the country, and would be cut down in the use of such waters, unless compensation was provided, to the condition in which nature left them or in which they happened to be

at the time any improvement was undertaken. This of course is not the law, the capacities having always to be considered, and any one locating on such waters takes subject to them. But the same reason applies, with equal force, to those waterways like the one here which, while not immediately or fully equipped for navigation, are so connected with others which are, that by improvement or otherwise they will in all likelihood be drawn into the common system, as they have been. This is not to say that the government could run a canal through a man's farm or overflow it with water and not pay for it. United States v. Lynch, 188 U. S. 445, 23 Sup. Ct. 349, 47 L. Ed. 539. This, besides being an actual physical invasion, would be altogether too remote an improvement to be ever anticipated, and so is not analogous. But where, as here, there is merely an extension or enlargement of natural means, which according to the evidence was to be reasonably looked for, it operates as no hardship and works no wrong to hold that the parties took subject to the servitude in favor of the public, which is now asserted, in the same way and to the same extent as if the stream were openly and notoriously navigable.

Nor is it of any consequence that the navigation by which the changes required in the bridge are made necessary is in part artificial. In Chicago, Burlington & Quincy R. R. v. Drainage Commissioners, 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 596, the creek which was utilized to drain and reclaim the farm land there involved was artificially enlarged; and yet it was held that the railroad company, at its own expense and without any provision for its reimbursement, could be required to remove from the creek the bridge and culvert which it had placed there, although it was sufficient, according to the depth and width of the channel at the time, and (unless it abandoned the crossing) to erect and maintain a new bridge which would conform to the regulations established by the drainage commissioners. Here was an entirely new, distinct, and artificial use, the only thing to be said in defense of it being that it was a related one, and yet the structure was required to be removed without compensation having been provided for it. Nor is it of any consequence that the case arose under the state and not the federal law, there being no difference in principle. Similarly also, although not so closely in point, in West Chicago Street Railway v. Chicago, 201 U. S. 506, 26 Sup. Ct. 518, 50 L. Ed. 845, a street railway which had lawfully constructed a tunnel under the Chicago river was required at its own cost and expense to lower the tunnel so as to provide a new and additional depth in the river which had been ascertained by competent local and federal authority to be necessary to meet the increased demands of navigation. In every such instance, as pointed out above, the structure involved of necessity, from its character and location, is subject to a servitude in favor of the public which may be asserted by the proper governmental authority acting for the common good. Property so conditioned, and affected with such an inherent infirmity, has no value which can claim or call for compensation when thus lawfully appropriated.

But it is further urged that the bridge was adopted by the government as an integral part of the national pike, the ferry crossing the

river being given up and the two ends of the road relocated so as to connect with the approaches to it.   By this, as it is contended, the bridge was recognized as a lawful structure, the mails being also carried over it as a regularly established post route.   But the sanction that was so given, if any, proceeded not from Congress which alone had authority to legalize it, but from the executive branch of the government which had no such power.   Conceding, then, that if Congress had acted in the premises the right to maintain the bridge could not be withdrawn without first providing compensation, there is no such result where the only adoption of the bridge was of the character thus shown.

Finding no occasion, then, for disturbing the verdict, the rule for a new trial must be discharged, and, thereupon proceeding to impose the penalty prescribed by law, the sentence of the court is that the Monongahela Bridge Company, defendant, pay a fine of $1,000 to the government of the United States, and pay the costs of prosecution, and that execution issue against the property of the said company to collect such fine and costs unless the same be paid within 10 days.