## GIBSON v. UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 155.   Argued January 15, 1897. — Decided March 22, 1897.

Riparian ownership on navigable waters is subject to the obligation to suffer the consequences of an improvement of the navigation, under an act of Congress, passed in the exercise of the dominant right of the Government in that regard; and damages resulting from the prosecution of such an improvement cannot be recovered in the Court of Claims.

THIS was a petition to recover damages because of the construction of a dike by the United States in the Ohio River at a point off Neville Island, about nine miles west of the city of Pittsburgh. The Court of Claims made the following findings of fact:

"I. In the year 1885, and before, the claimant was the owner in her own right and in possession of a tract of land containing about 20 acres, situate on Neville Island, in the Ohio River, 9 miles below the city of Pittsburg, in the county of Allegheny and State of Pennsylvania.

"II. The claimant's land, at the time of the alleged grievance, was in a high state of cultivation, well improved with a good dwelling house, barn and other outbuildings. The claimant was in the year 1885, and is now, engaged in market gardening, cultivating and shipping strawberries, raspberries, potatoes, melons, apples, peaches, etc., to the cities of Pittsburg and Allegheny, Pa., for sale.

"III. The claimant's farm has a frontage of 1000 feet on the north, or main navigable, channel of the Ohio River, where the claimant has a landing, which was used in shipping the products from, and the supplies to, her said farm; that the said farm extends across the said Neville Island in a southwesterly direction to the south channel of said Ohio River, which is not navigable; that the said landing is the only one on claimant's farm from which she can ship the products from, and supplies to, her farm.

"IV. Congress, by the river and harbor acts of July 5, 1884, 23 Stat. 133, 147, and August 5, 1886, 24 Stat. 310, 327, authorized and directed the improvement of the said Ohio River as follows:

"'Improving the Ohio River: Continuing improvement, six hundred thousand dollars' . . . (act 1884).

"'Improving the Ohio River: Continuing. improvement, three hundred and seventy-five thousand ($375,000) dollars' . . . (act 1886).

"Under said authority Lieut. Col. William E. Merrill, of the engineer corps of the U. S. Army, by the direction of the chief of engineers of the U. S. Army, and the Secretary of War, commenced, June 17, 1885, the construction of a dike 2200 feet in length to concentrate the water-flow in the main channel of the Ohio River, beginning at a point on said Neville Island 400 feet east of the claimant's farm and running in a northwesterly direction with the main or navigable channel of the said Ohio River to the outer point of a bar in said river known as Merriman's bar, contiguous to and extending into the said river from the northwest point of claimant's farm; that the said dike has been completed to, and beyond, the northeastern point of. said Merriman's bar.

"V. The construction of said dike by the United States for the purposes aforesaid has substantially destroyed the landing of the claimant, by preventing the free egress and ingress to and from said landing on and in front of the claimant's farm, to the main or navigable channel of said river.

"The claimant is unable to use her landing for the shipment of products from, and supplies to, her farm for the greater part of the gardening season on account of said dike obstructing the passage of the boats; that she can only use the said landing at a high stage of water. That during the ordinary stage of water, the claimant cannot get the products off, or the supplies to, her farm, without going over the farms of her neighbors to reach another landing.

"VI. The claimant's land was worth $600 per acre before the construction of the said dike; that it is now greatly reduced in value (from $150 to $200 per acre) by the obstruction caused

by said dike; that the damage to the claimant's farm exceeds the sum of $3000.

"VII. Claimant's access to the navigable portion of the stream was not entirely cut off; at a 9-foot stage of the water, which frequently occurs during November, December, March, April and May, she could get into her dock in any manner; that from a 3-foot stage she could communicate with the navigable channel through the chute; that at any time she could haul out to the channel by wagon.

"VIII. There was no water thrown back on claimant's land by the building of said dike, and that said dike has not itself come into physical contact with claimant's land and has not been the cause of any such physical contact in any other way. In making the improvement the defendants did not recognize any right of property in the claimant, in and to the right alleged to be affected, did not attempt or assume to take private property in and by the construction of the dike, but proceeded in the exercise of a claimed right to improve the navigation of the river."

And upon these findings the court held, as a conclusion of law, that the claimant was not entitled to recover, and dismissed the petition.

The opinion of the court by Weldon, J., discusses the case at length, citing many decisions, and maintains the conclusion on the grounds that the court had no jurisdiction; and that, if it had, there still could be no recovery because the United States were not responsible to claimant for injuries suffered in the use and occupation of her property in consequence of the construction of the works. 29 C. Cl. 18.

Mr. *T. H. N. McPherson* (with whom was Mr. *N. W. Shafer* on the brief) for appellant.

Mr. *Assistant Attorney General Dodge* for appellees.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

All navigable waters are under the control of the United

States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various States and individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the Federal government by the Constitution. *South Carolina* v. *Georgia,* 93 U. S. 4; *Shively* v. *Bowlby,* 152 U. S. 1; *Eldridge* v. *Trezevant,* 160 U. S. 452.

In *South Carolina* v. *Georgia,* a proposed improvement of the Savannah River consisted of the practical closing of one channel around an island and the throwing of water into other channels, to the substantial improvement of the harbor of Savannah. This court held that, in view of the general rule, although structures deemed by Congress to be in aid of navigation might in fact be in obstruction of certain methods of navigation of the particular stream, their construction was, nevertheless, within the Federal power, and Mr. Justice Strong, delivering the opinion of the court, said : " It is not, however, to be conceded that Congress has no power to order obstructions to be placed in the navigable waters of the United States, either to assist navigation or to change its direction by forcing it into one channel of a river rather than the other. It may build lighthouses in the bed of the stream. It may construct jetties. It may require all navigators to pass along a prescribed channel, and may close any other channel to their passage. If, as we have said, the United States have succeeded to the power and rights of the several States, so far as control over interstate and foreign commerce is concerned, this is not to be doubted. . . . Upon this subject the case of *Pennsylvania* v. *The Wheeling and Belmont Bridge Co.,* 18 How. 421, is instructive. There it was ruled that the power of Congress to regulate commerce includes the regulation of intercourse and navigation, and consequently the power to determine what shall or shall not be deemed, *in the judgment of law,* an obstruction of navigation. . . . The case of *The Clinton Bridge,* 10 Wall. 454, is in full accord with this decision. It asserts plainly the power of Congress to declare what is and what is not an illegal obstruction in a navigable stream."

In *Shively* v. *Bowlby*, the leading authorities. of the courts of the United States and of most of the States, and of Great Britain, as to the character of the title to submerged land, are considered, and the conclusion announced that the title is in each State, with full power in the state legislature to confer it on individuals, subject at all times to the servitude of the Federal government for regulation and improvement of navigation.

In *Eldridge* v. *Trezevant*, the doctrine existing in the State of Louisiana that lands abutting on the rivers and bayous were subject to a servitude in favor of the public, whereby such portions thereof as were necessary for the purpose of making and repairing public levees might be taken, in pursuance of law, without compensation, was fully recognized as enforceable. notwithstanding the Fourteenth Amendment.

By the established law of Pennsylvania, as observed . by Mr. Justice Gray in *Shively* v. *Bowlby*, " the owner of lands bounded by navigable water has the title in the soil between high and low water mark, subject to the public right of navigation, and to the authority of the legislature to make public improvements upon it, and to regulate his use of it."

The constitution of that State, prior to 1873, provided that no man's property could " be taken or applied to public use without the consent of his representatives and without just compensation being made."

In *Monongahela Navigation Co.* v. *Coons,* 6 Watts & Searg. 101, plaintiff's mill site was destroyed by the backing up of water by a dam built by a canal company under authority of law for the improvement of navigation, and the.Supreme Court of Pennsylvania held this to be a mere consequential damage resulting from the exercise of the public right to improve navigation ; that it was *damnum absque injuria ;* and that such flooding and injury did not amount to a taking under the constitution.

In the opinion of the court it was. stated by Chief Justice Gibson :

" It cannot be said that the plaintiff's mill was taken or applied, in any legitimate sense, by the State, or by the company

invested with its power; nor can it be said that he was deprived of it. In the case of the *Philadelphia and Trenton Railroad*, 6 Whart. 25, the words in the first paragraph were allowed to have their obvious and popular meaning, so as to be restrained to property taken away, and not extended to property injured by an act which did not amount to an assumption of the possession; . . .

" Still, it is only to a case of taking that the obligation extends; and when a corporation acts by virtue of a constitutional law, it is subject to no other responsibility for acts of consequential damage, than is specially provided for. . . .

"It is not, therefore, enough to set before us a case of moral wrong, without showing us that we have legal power to redress it. Beyond constitutional restraint or legislative power, there is none but the legislative will, tempered by its sense of justice, which has happily been sufficient, in most cases, to protect the citizen. Compensation has been provided for every injury which could be foreseen, whether within the constitutional injunction or not, in all laws for public works by the State or a corporation; though cases of damage have occurred which could neither be anticipated nor brought within the benefit of the provision by the most strained construction. In one instance, a profitable ferry on the Susquehanna, at its confluence with the Juniata, was destroyed by the Pennsylvania canal; and, in another, an invaluable spring of water, at the margin of the river, near Selinsgrove, was drowned. These losses, like casualties in the prosecution of every public work, are accidental, but unavoidable; and they are but samples of a multitude of others."

Numerous subsequent cases sustain the rule thus laid down, which is, indeed, the general rule upon the subject.

The Pennsylvania constitution of 1873 contained this additional provision: " Municipal and other corporations and individuals, invested with the privilege of taking private property for public use, shall make just compensation for property taken, injured or destroyed, by the construction or enlargement of their works, highways or improvements, which compensation shall be paid or secured before such

taking, injury or destruction"; and in *Pennsylvania Co.* v. *Marchant*, 119 Penn. St. 541, it was ruled that this had relation to such injuries to one's property as were the natural and necessary results of the original construction or enlargement of its works by a corporation, and not of their subsequent operation. *S. C.* 153 U. S. 380.

The Fifth Amendment to the Constitution of the United States provides that private property shall not "be taken for public use without just compensation." Here, however, the damage of which Mrs. Gibson complained was not the result of the taking of any part of her property, whether upland or submerged, or a direct invasion thereof, but the incidental consequence of the lawful and proper exercise of a governmental power.

The applicable principle is expounded in *Transportation Co.* v. *Chicago*, 99 U. S. 635. In that case, plaintiff being an owner of lands situated at the intersection of La Salle street, in Chicago, with the Chicago River, upon which it had valuable dock and warehouse accommodations, with a numerous line of steamers accustomed to land at that dock, was interrupted in his use thereof by the building of a tunnel under the Chicago River by authority of the state legislature, in accomplishing which work it was necessary to tear up La Salle Street, which precluded plaintiff from access to his property for a considerable time; also to build a coffer dam in the Chicago River, which excluded his vessels from access to his docks; and such an injury was held to be *damnum absque injuria.* This court said, again speaking through Mr. Justice Strong: "But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the State or its agents, or give him any right of action. This is supported by an immense weight of authority. Those who are curious to see the decisions will find them collected in Cooley on Constitutional Limitations, page 542 and notes. The extremest quali-

fication of the doctrine is to be found, perhaps, in *Pumpelly* v. *Green Bay Company*, 13 Wall. 166, and in *Eaton* v. *Boston, Concord &c. Railroad*, 51 N. H. 504. In those cases it was held that permanent flooding of private property may be regarded as a 'taking.' In those cases there was a physical invasion of the real estate of the private owner, and a practical ouster of his possession. But in the present case there was no such invasion. No entry was made upon the plaintiff's lot. All that was done was to render for a time its use more inconvenient."

Moreover, riparian ownership is subject to the obligation to suffer the consequences of the improvement of navigation in the exercise of the dominant right of the Government in that regard. The legislative authority for these works consisted simply in an appropriation for their construction, but this was an assertion of a right belonging to the Government, to which riparian property was subject, and not of a right to appropriate private property, not burdened with such servitude, to public purposes.

In short, the damage resulting from the prosecution of this improvement of a navigable highway, for the public good, was not the result of a taking of appellant's property, and was merely incidental to the exercise of a servitude to which her property had always been subject.

*Judgment affirmed.*