**FRANKLIN et al. v. UNITED STATES.**
No. 7583.

Circuit Court of Appeals, Sixth Circuit.
Jan. 20, 1939.

HAMILTON, Circuit Judge, dissenting.

———◆———

---

Sam Costen, of Memphis, Tenn. (Sam Costen, Charles C. Crabtree, and Carl R. Graves, all of Memphis, Tenn., on the brief), for appellants.

R. G. Draper, of Memphis, Tenn. (William McClanahan, C. P. J. Mooney, and R. G. Draper, all of Memphis, Tenn., on the brief), for the United States.

Before SIMONS, ALLEN and HAMILTON, Circuit Judges.

ALLEN, Circuit Judge.

The principal question presented is whether the construction by the · United States of dikes on the bank and in the bed of the Mississippi River for the purpose of changing the current in order to improve navigation, which resulted after a year in the washing away of appellants' land on the opposite side of the river, constitutes an appropriation of private property within the purview of the Fifth Amendment to the Constitution of the United States, U. S. C. A. A demurrer interposed to the declaration was sustained by the District Court. From the judgment dismissing the declaration this appeal is prosecuted.

Two actions instituted separately by appellants, each of whom owned an undivided one-fourth interest in 1,100 acres of land in Tennessee, located on the east bank of the Mississippi River, were consolidated by agreement in the District Court.

The declaration avers that the land in question is fertile and so elevated above the waters of the Mississippi as to be fully useful at all times for farming; that acting under the Mississippi River Flood Control Act, Title 33, U. S. C., Sections 702a–702n, inclusive, 33 U.S.C.A. § 702a–702n, the United States in 1931 constructed certain dikes in the Mississippi River a short distance above and opposite appellants' land and upon the Arkansas side of the river.

The declaration further alleges, in substance, that the dikes were constructed by the driving of two rows of piling, parallel and close together, bound together with steel cable and filled between with crushed rock, their character being such as to effect a permanent obstruction of the flow of the water in the river; that they ex-tend out into the river practically at right angles from the Arkansas bank, from 1,300 to 4,000 feet into the bed of the river, and above the surface of the water at any ordinary stage; that prior to the construction of the dikes, the current in the river opposite appellants' lands was away from and not against the Tennessee bank, where the lands lay; that the purpose and effect of the construction was to force the current of the river away from its natural course, almost at a right angle across the river, and against the bank on the Tennessee side, in order to improve navigation; that as a result of such change of current, within one year after the completion of the dikes all but a few acres of appellants' land was entirely washed away, and its former location became the bed and channel of commerce of the river; that the result of the construction of the dikes was an intentional direct invasion and complete destruction of the property.

The declaration further alleges that no compensation has been paid or provided to be paid for the damages averred to have been sustained, and that the destruction of the lands was a direct and proximate result of the construction of the dikes; that such destruction was inevitable, and that such result would occur was well known to the Government and its agents at the time of construction; that the construction of the dikes constituted a taking or appropriation of appellants' lands or of an easement thereon for public use within the scope and meaning of the Fifth Amendment to the Constitution of the United States, which provides that private property shall not be taken for public use without just compensation.

The Government demurred upon the grounds:

(1) That the owner of an undivided one-fourth interest in the land cannot prosecute the action without joining the other co-tenants;

(2) That the facts alleged do not constitute a taking within the purview of the Fifth Amendment;

(3) That the Mississippi River Flood Control Act does not provide for recovery for the damage averred; and

(4) That the cause of action, if any, is in tort, and that the court has no jurisdiction of a tort action against the United States.

In sustaining the demurrer the court ruled on all grounds except that of joinder

of necessary parties. While that question is again urged here, it is not necessary to consider it in view of our holding upon other branches of the case.

The decision of the main question, namely, whether the case presents a taking of property without compensation, in violation of the Fifth Amendment, depends upon the power of the United States to construct the dikes in question and its liability for the damage described as caused by the construction. The Mississippi River Flood Control Act specifically authorized this work, and the Congress, in the exercise of its express power to regulate interstate commerce (Art. 1, Sec. 8, cl. 3, United States Constitution, U. S. C. A.) may improve navigation. Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23; South Carolina v. Georgia, 93 U.S. 4, 23 L.Ed. 782; Gilman v. Philadelphia, 3 Wall. 713, 724, 18 L.Ed. 96. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L. Ed. 688. This being the case, "Riparian ownership is subject to the obligation to suffer the consequences of the improvement of navigation in the exercise of the dominant right of the government in that regard." Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 580, 41 L.Ed. 996. See also Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; Hannibal Bridge Co. v. United States, 221 U.S. 194, 31 S.Ct. 603, 55 L.Ed. 699. Cf. Lewis Blue Point Oyster Co. v. Briggs, 229 U.S. 82, 87, 33 S.Ct. 679, 57 L.Ed. 1083; Willink v. United States, 240 U.S. 572, 580, 36 S.Ct. 422, 60 L.Ed. 808; United States v. Chandler-Dunbar Water Power Co., 229 U. S. 53, 33 S.Ct. 667, 57 L.Ed. 1063. In the last case the court said, at page 62, 33 S.Ct. at page 671:

"This title of the owner of fast land upon the shore of a navigable river to the bed of the river * * * is subordinate to the public right of navigation, and however helpful in protecting the owner against the acts of third parties, is of no avail against the exercise of the great and absolute power of Congress over the improvement of navigable rivers. That power of use and control comes from the power to regulate commerce between the states and with foreign nations. It includes navigation and subjects every navigable river to the control of Congress. All means having some positive relation to the end in view which are not forbidden by some other provision of the Constitution are admissible. If, in the judgment of Congress, the use of the bottom of the river is proper for the purpose of placing therein structures in aid of navigation, it is not thereby taking private property for a public use, for the owner's title was in its very nature subject to that use in the interest of public navigation."

The power to improve navigation includes the power to divert a navigable stream by the closing of one of its channels. South Carolina v. Georgia, supra. That case holds that the Congress has power to order obstructions to be placed in the navigable waters of the United States, either to assist navigation or to change its direction by forcing it into one channel of the river rather than the other. In the making of such improvements, the United States is not liable for consequential damage. Gibson v. United States, supra; Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Jackson v. United States, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363. Cf. United States v. Cress, 243 U.S. 316, 327, 37 S.Ct. 380, 61 L.Ed. 746. The meaning of the term "consequential damage" is illustrated in Northern Transportation Co. v. Chicago, 99 U.S. 635, 25 L. Ed. 336, which held that acts done in the proper exercise of governmental powers and not directly encroaching upon private property, though their consequences may impair its use, do not constitute a taking within the meaning of the constitutional provision.

In the instant case the construction of the dikes was a proper exercise of governmental power, and they did not directly encroach upon private property. The dikes at no point touch upon appellants' land, but are on the Arkansas side of the river. It is alleged that as a result of the construction, within one year after the completion of the dikes, all but a few acres of the land was washed away. This averment describes a gradual erosion, such as was held in Bedford v. United States, supra, to give rise to no recovery.

But it is urged that the doctrine of United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539; Pumpelly v. Green Bay Co., 13 Wall. 166, 20 L.Ed. 557, and United States v. Cress, supra, requires a different conclusion. In the Pumpelly and Lynah Cases the erection by the United States or by a quasi-public corporation of a dam which resulted in backing water permanently over privately-owned land abutting on navigable waters, was held to give rise to

an implied contract to pay for the damage. The Cress Case presented questions of damage to parcels of land abutting on non-navigable streams, effected by government dams in navigable streams. The general scope of these holdings, as stated in United States v. Lynah, supra, is that [page 357] "where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the 5th Amendment."[1] Such a flooding is declared to constitute an actual invasion of private property. Or, as elsewhere stated (Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 265, 68 L.Ed. 608), "in order to create an enforceable liability against the government, it is at least necessary that the overflow be the direct result of the structure, and constitute an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property."

The apparent conflict between the doctrine of the Lynah, Pumpelly, and Cress Cases, and the Gibson, Bedford, and Jackson Cases, supra, is resolved when it is borne in mind that the doctrine in the first three cases is a deviation from the general rule, constituting, as the court said in Northern Transportation Co. v. Chicago, supra, at page 642, "The extremest qualification of the doctrine * * *." The court then went on to point out that in the Pumpelly Case "there was a physical invasion of the real estate of the private owner, and a practical ouster of his possession." In the instant case the United States did not physically invade the land nor oust the owner from possession. The test of an unlawful taking within the scope of the Fifth Amendment is not the extent of the injury. "It is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking." United States v. Cress, supra, at page 328, 37 S.Ct. at page 385.

An illustration of the sweeping manner in which the Supreme Court has upheld the power of the United States to make improvements without incurring liability for consequential damage is shown in the case of John Horstmann Co. v. United States, 257 U.S. 138, 42 S.Ct. 58, 66 L.Ed. 171.

That was an action for damages following the construction of a government irrigation project by which the body of the ground water rose throughout the entire section. The appellant was manufacturing soda from the water of a lake, the level of which rose about nineteen feet, destroying the value of appellant's property. The court assumed causal connection between the work of the Government and the rise of waters of the lake and the consequent destruction of appellant's property, but said that [page 59] "it does not follow that the government is under obligation to pay therefor, as for the taking of the properties." It declared that "what is done may be in the exercise of a right and the consequences only incidental, incurring no liability," and held that there could be no recovery.

In the Gibson, Bedford and Jackson cases, supra, substantial and permanent damage to private property resulting from constructions similar in character to that attacked herein was held not to constitute a taking.

In the Gibson Case, a dike 2,200 feet in length, had been constructed by the United States in the Ohio River, in order to concentrate the water-flow in the main channel of the river. It was only 400 feet east of the claimant's farm. It substantially destroyed the use of the claimant's landing and reduced the value of the land from $600 to $200 per acre. As there was no physical invasion of the real estate and no actual ouster of the owner's possession, recovery was denied. The court quoted with approval from South Carolina v. Georgia, and Northern Transportation Co. v. Chicago, supra, and held that the prevention of the free egress and ingress to the claimant's land was not a direct invasion, but the incidental consequence of the lawful and proper exercise of a governmental power.

In the Bedford Case, it was alleged that in consequence of the construction of a revetment upon the bank of the Mississippi, the claimant's lands were eroded and overflowed. The court determined that the damage was strictly consequential, and denied recovery. We are unable to see any difference in principle between the Bedford and the instant case.

---

[1] In United States v. Grizzard, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165, 31 L.R.A.,N.S., 1135, there had been an actual taking of part of claimant's land by permanent flooding.

In the Jackson Case, the land in question had been flooded annually by the waters of the Mississippi, due to the construction of a continuous system of public works, built "for the purpose of so confining the waters of the river between lines of embankment, or levees, as to give increased elevation and velocity and force to the current in order to scour and deepen the channel." [page 1013.] In executing their plans the officers of the United States had "by the levees which they had constructed or maintained along the front of the White river and Tensas basins, prevented the flow of a large volume of water into those basins * * * and had thus increased largely the volume of water flowing past the claimants' land." The confining of the flood waters of the Mississippi between the levees' lines had given them an increased velocity, a higher elevation, and a stronger and more forceful current, which caused the destruction of crops, the drowning of livestock, the undermining and washing away of buildings, fences and improvements, the washing off of the soil, and the entire destruction of the value of the land.

In the instant case appellants urge that since the alleged purpose in constructing the dike was to change the current of the river, a direct invasion results. They contend that the riparian owner has a right to have the river come to him unchanged in its natural condition. This is their right as against individual riparian owners (United States v. Chandler-Dunbar Water Power Co., supra, at page 70, 33 S.Ct. 667; Cubbins v. Mississippi River Commission, 241 U.S. 351, 366, 36 S.Ct. 671, 60 L.Ed. 1041), but not as against the paramount power of the United States to improve navigation. United States v. Chandler-Dunbar Water Power Co., at page 70, 33 S.Ct. 667; Cubbins v. Mississippi River Commission, at page 369, 36 S.Ct. 671; Hughes v. United States, 230 U.S. 24, 33 S.Ct. 1019, 57 L.Ed. 1374, 46 L.R.A.,N.S., 624. The power of Congress extends to the whole expanse of the stream. Greenleaf-Johnson Lumber Co. v. Garrison, Secretary of War, 237 U.S. 251, 263, 35 S.Ct. 551, 59 L.Ed. 939. The United States is not responsible to riparian owners for consequential damages from the deflection of waters by reason of structures lawfully constructed in aid of navigation.

We can see no practical distinction between changing the current of the river here, and confining the waters, concentrating them so as to give them increased eleva-tion, velocity and force, and diverting the natural flow of the river, as in the Jackson Case. There the court held that the alteration of the current and of the river flow gave rise to no liability on the part of the United States. Here the fact that the current was altered by the dikes constructed for the improvement of navigation is no occasion for modifying the general rule that in absence of an actual entry upon and invasion of private property, the damage done by the erection of lawful construction in a navigable river is as a matter of law consequential, and that no recovery can be had apart from statute.

The demurrer was correctly sustained with reference to the third ground therein stated. The Mississippi River Flood Control Act does not, as to the construction described in the declaration, enlarge the liability of the United States. Title 33, U.S.C., Section 702c, 33 U.S.C.A. § 702c, the applicable section, relates to the construction of or the failure to construct levees, and not to the construction of dikes in the river-bed.

The demurrer was correctly sustained as to the fourth ground. The cause of action, if any, is in tort. Sanguinetti v. United States, supra. But the United States is not liable in tort, and the federal court has no jurisdiction of a tort action against the United States. Ball Engineering Co. v. J. G. White & Co., 250 U.S. 46, 57, 39 S.Ct. 393, 63 L.Ed. 835.

The judgment is affirmed.

SIMONS, Circuit Judge (concurring).

I concur in the conclusion reached by the controlling opinion, and in general with its reasoning. It is clear, however, from the analysis of the authorities therein made, and from the discussion of them in the dissenting opinion, that there is conflict between the holdings in the Pumpelly and Lynah Cases on the one hand and the Gibson, Bedford and Jackson Cases on the other, a conflict pointed out in respect to some of them by Mr. Chief Justice White and Associate Justices Fuller and Harlan in the dissenting opinion in the Lynah Case. In any event the generalizations of the earlier cases have been, as indicated in the Horstmann Case, made subject to exceptions in subsequent cases.

To place the distinction between the two lines of authorities upon the ground that to create an enforceable liability against the Government there must be an actual

permanent invasion of the land amounting to an appropriation of it, and not merely an injury to the property, may be sound in principle but becomes difficult of application in specific cases because of differences in view as to what amounts to invasion and appropriation. The servitude of privately owned lands forming the banks and bed of a stream to the interests of navigation is a natural servitude confined to such streams as in their ordinary and natural condition are navigable in fact. United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746. It was there said, however, that the power of the Government under the commerce clause, like other powers, must be exercised in subordination to the Fifth Amendment. It would seem to me, however, conceding the principle, that in respect to riparian lands subservient to the exercise of a constitutional power, within the reasonable scope of its grant, there can be no taking of private property when the lands are in fact made to yield to the Government in response to the servitude, to which by reason of their location they have always been subject. The Cress Case involved lands on non-navigable tributaries of a navigable river. It was there assumed, though not decided, that the owners of such lands had rights no greater than the owners of lands bordering upon a navigable stream. But if the principle of natural servitude is confined to lands bordering streams navigable in fact in their ordinary and natural condition, the Cress Case does not support the present claimants.

HAMILTON, Circuit Judge (dissenting).

I am unable to concur in the opinion of the Court.

The appellee, for the purpose of this appeal, must admit the truth of all the facts well plead in appellants' petitions and all intendments and inferences that may fairly and reasonably be drawn therefrom and these facts will be considered in the light most favorable to appellants.

Appellants allege that by reason of the construction of the dikes the current of the river was changed and forced to the opposite shore and as a direct and proximate result thereof their lands which theretofore had been above ordinary high water mark, became a part of the bed of the river and its channel of commerce. They further allege that the appellee, in making the improvement, knew before the dikes were built that their lands would be taken and destroyed as a result of the construction.

The Mississippi river is a vast body of water continually changing its bed or channel, sometimes abruptly, other times slowly and insiduously and its riparian owners hold their lands subject to the servitude of the right of the public to construct levees, revetments and dikes to keep the river within its ordinary channels. When property is taken or damaged in the enforcement of this servitude there is no exercise of the right of eminent domain and the constitutional limitation making compensation a prerequisite before taking is inapplicable because the owner of the land is compelled to submit to only an obligation impressed by law upon the property by the original grant or by the common law under which the land was acquired or held and independently of the right of eminent domain, no compensation of any sort is due.

Those who own land fronting on the Mississippi river gain all that is made by alluvion and lose all that is carried away by abrasion due to the natural movement of the stream. However, some of its shore is an under stratum never moved or broken up since creation and this is fast land.

On these fast lands the people make improvements and build homes and are free from the servitude of public improvement of lands subject to alluvion and abrasion.

The description of appellants' lands shows them to have a natural embankment or levee along the river shore and in their natural state not subject to overflow or washing and above ordinary high water mark. The Mississippi is both the friend and enemy of man. It furnishes a broad highway of commerce across the nation and its flood waters long have been a threat of disaster to the thousands who live in its fertile valley.

From the earliest times the people living on its alluvial shores have sought protection against its floods. The inhabitants first constructed their own local protection by throwing up earthern mounds around their plantations, then there were combinations of owners and communities which protected by levees, larger areas. Levee districts were later formed and chartered in each state until there were about twenty-seven in the alluvial valley proper in addition to those north of it. The United States Government took no part in flood protection until 1879 and since that time there has been

a constant effort to confine the river within its natural channel.

To accomplish this objective, the construction of levees has been the common practice. The lands of the appellants lie on the Tennessee shore in the Hatchee river valley and on the opposite Arkansas shore is the St. Francis Basin which is made up of a vast area of swamps and bayous. It is difficult to confine the channel on the Arkansas side but because of higher land it is easily confined on the Tennessee shore. The construction complained of in appellants' petition when considered in the light of geographic location, of which we may take judicial notice, shows it was the purpose of the appellee to divert the channel of the river from the constantly shifting Arkansas shore to the firmer and certain Tennessee shore and in doing this the fast land of appellants became the channel of the river and the higher and receded land, its shores.

The nation cannot exist without making great demands of individuals. It may require of them in time of war the service of their bodies and the sacrifice of their lives which is necessary for the preservation of the whole. An enemy conquering a country would also tyrannize its people, hence the individual's devotion to his country is not disinterested sacrifice but rests on his co-operative position in the individual state. One may also in time of peace be required to contribute his property for the benefit of his nation but this contribution must be suitably distributed. Whatever exists is subject to perish for the good of the country and this includes the ownership of property. The State should not arbitrarily interfere with the uses of property to which individuals have title and whatever it expropriates for the benefit of the whole should be done only on just compensation to the owner. This principle rests, not so much on the sanctity of ownership of property, as on the just distribution of the burdens of government. If the state needs, for the use of the public, the property of an individual, it must not burden its owner with more than his proportionate share.

According to the allegations of appellants' pleadings, their lands did not lie within the dangerous flood area of the Mississippi river and its taking was not a contribution to public use which brought to them an equal benefit but they were required to contribute more than their share for the public good. This is inequality, the antithesis of justice.

In these days when men and women are harried and oppressed in many quarters of a troubled world, it is useful to courts, in deciding issues between the government and its citizens, to bear in mind the simple words of the Bill of Rights which guarantee the liberties we cherish. The concluding clause of the Fifth Amendment that private property shall not be taken for public purposes without just compensation is an affirmance of a great doctrine established by common law for the protection of private property and equality of burden of citizenship. It is a principle of universal law that wherever the right to own property is recognized in a free government, practically all other rights become worthless if the government possesses an uncontrollable power over the property of every citizen.

Nature, in its bounty, gave to all of the people great highways of commerce, made up of the sea, lakes and rivers and no individual has the right to possess or use them to the exclusion of the public. All who acquire property bound by the water's edge of navigable streams take it subject to the servitude imposed by law for the improvement of the stream for the purpose of navigation. The Government has the power to do whatever it deems necessary for the purpose of navigation in keeping free and clear the bed of the stream to the crest of the ordinary high water mark. However, this power is limited by the Fifth Amendment and cannot be used to appropriate to navigation the property of the citizen lying above the ordinary high water mark of a navigable stream. It has the unfettered right to erect dams, dikes, piers, bridges and other structures in navigable streams for the purpose of improving navigation but if it could be known by the exercise of a reasonable care by public officials lawfully authorized to thus improve navigation that the result will be the diverting of the current into a new channel and over fast lands above ordinary high water mark, there is a taking under the Fifth Amendment.

The vital issue in this case is whether the injuries complained of amount to a taking of appellants' property within the constitutional meaning of that term, which is the transferring by a governmental agency or public utility into its own possession or keeping or appropriating or entering into the possession or use of another's prop-

erty without his consent. It might seem this could be answered by a simple statement, but an examination of the decisions of the Supreme Court on the subject reveals apparent conflicts which disappear when the cases are closely analyzed.

The rights of the public for the purposes of navigation extend only to the natural state of the stream and beyond that property cannot be taken without compensation. Pumpelly v. Green Bay Company, 13 Wall. 166, 80 U.S. 166, 182, 20 L.Ed. 557; United States v. Cress, 243 U.S. 316, 332, 37 S.Ct. 380, 61 L.Ed. 746; Packer v. Bird, 137 U.S. 661, 667, 11 S.Ct. 210, 34 L.Ed. 819; United States v. Rio Grande Dam & Irrigation Company, 174 U.S. 690, 698, 19 S.Ct. 770, 43 L.Ed. 1136; Leovy v. United States, 177 U.S. 621, 631, 20 S.Ct. 797, 44 L.Ed. 914; United States v. Chicago B. & Q. Railroad Company, 8 Cir., 82 F.2d 131, 106 A.L.R. 942.

All general statements in opinions of courts that acts done in the proper exercise of governmental powers and not directly encroaching upon private property, though their consequences may impair its use, are not a taking within the meaning of the constitutional provision and do not entitle the owner to compensation, must be read in the light of the facts peculiar to each case, and when this is done, there are no conflicts in judicial pronouncements. In Gibson v. United States, 166 U.S. 269, 276, 17 S.Ct. 578, 41 L.Ed. 996, the United States constructed a dike in the Ohio River at a point off of Neville Island about nine miles west of the city of Pittsburgh. The appellant owned a tract of land on the island fronting on the river which was in a high state of cultivation and well improved. She had a landing on the island from which she loaded and shipped by river the products of her farm. By reason of the construction of the dikes, which was done under congressional authority, ingress and egress to and from her landing by boats were completely destroyed, except during periods of high water. The appellant had no outlet for the products of her farm except over the land of her neighbors and the construction of the dike decreased the value of her farm from $600 to $200 per acre. The Supreme Court ruled that there was no invasion or actual taking of appellant's property and that her damages were consequential, because there was no entry upon her property by flooding or changing the course of the stream.

In the case of Bedford v. United States, 192 U.S. 217, 225, 24 S.Ct. 238, 48 L.Ed. 414, the appellants were the owners of five or six thousand acres of improved land on the Mississippi River in the State of Louisiana. Prior to the spring of 1876, the river flowed around a narrow neck of land known as DeSoto Point and by the city of Vicksburg, and in a southwesterly direction. In the spring of 1876, due to gradual erosion, the river broke through the point and straightened its channel, taking its course directly south, and moved with great velocity against its Mississippi bank, which resulted in its main channel being several miles away from the city of Vicksburg. The old channel became unfit for navigation and boats could no longer dock there. Between 1878 and 1884, the United States constructed about 10,700 feet of revetment along the banks of the Mississippi at Delta Point, for the purpose of preventing further erosion and to force the current back into its former channel. After this construction, the channel and current of the river were gradually directed toward the lands of the Bedfords which were situated about six miles below DeSoto Point and about the year of 1882, reached these lands and eroded and overflowed 2,300 acres. The cause of the deflection of the river upon Bedford's property was its natural cutoff, not the construction of the revetments which did not change its course, but kept it at the point where nature placed it. The revetment did not cause the erosion of Bedford's land but only accelerated it, the extent of which was conjectural. The court, in denying the appellant damages, said [page 240]: "In other words, the object of the works was to preserve the conditions made by natural causes."

In the case of Jackson v. United States, 230 U.S. 1, 23, 33 S.Ct. 1011, 57 L.Ed. 1363, the lands were situated at Jackson Point in the alluvial valley of the Mississippi on the left bank of the river, forty miles below Natchez and twenty-five miles above the mouth of Red River. The owners of the property had built levees which resulted in protecting it from destructive overflows and for many years it was highly improved, well stocked, of great productive capacity and of large value. The United States in 1883 constructed a levee on the west bank of the river opposite the lands of the appellants which relieved the pressure on their private levees but augmented the risk of overflow by increasing the danger of a break in them. By these levees the United

States prevented large quantities of water, which otherwise would have reached the Gulf through the Atchafalaya river, from taking its natural course, thus causing it to back up against appellants' levee and overflow it and ruin their crops and destroy the value of their land for agricultural and grazing purposes.

The lands of appellants were located within the limits of a narrow strip lying between the low water bank of the Mississippi river and the highlands east of it between Vicksburg and Baton Rouge where the highlands skirt close to the river bank and were not protected by levee construction other than that built by the appellants, and it was not claimed by them that in the absence of all levees and in a state of nature they would not in seasons of ordinary high water be overflowed. They had built a levee to protect their land which answered that purpose if no other levees were built which would increase the flow of water in the river and raise the flood level.

In denying damages, the Supreme Court rested its decision on the ground that a private individual had the right to construct a levee for the protection of his own property so long as he did not interfere with the natural flow of the stream, and as a corollary to this principle, the United States, the States, Levee Boards and similar agencies had the same power to construct levees although in so doing the water was forced over the levee theretofore constructed by the individual.

In the case of Sanguinetti v. U. S., 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608, the United States constructed a canal for the improvement of navigation, and the excavated material was put on the lower side of the canal making a levee, of which the dam was practically a continuation, which was the most convenient way to dispose of the material and also helped to prevent erosion of the lower bank. During a flood period the canal proved insufficient to carry off the waters which overflowed the lands of appellant lying above it, damaging and destroying crops and trees and to some extent the land, which would have been flooded to a certain degree had the canal not been constructed, and none of it was permanently flooded nor for such length of time as to prevent its use for agricultural purposes. The Supreme Court held this not a taking for which the United States was liable but that it was in its nature an indirect and consequential injury for which

no implied obligation to pay arose on the part of the government.

The foregoing are the principal cases on which the lower court relied in sustaining the demurrer and on which the appellee here relies for affirmance. There is a line of demarcation in each from the case at bar in that the water change was confined within the ordinary high water level of the stream made by nature. There was no artificial increase in level, width or flow in any of these cases.

In the case of Pumpelly v. Green Bay Company, supra, the appellee had erected a dam across Fox river, the northern outlet of Lake Winnebago, by which the waters of the lake were raised so high as to forcibly, and with violence, overflow the appellant's land from the time of the completion of the dam in 1861, to the commencement of the suit, the water coming in with such violence as to tear up his trees and grass by the roots, and wash them, with his hay by the tons away, to choke up his drains and fill up his ditches, to saturate some of his lands, and to injure other parts by bringing and leaving on them deposits of sand. It is to be observed, also, that the waters of Lake Winnebago were raised so high as to overflow with violence all the lands of the appellant from the time of the completion of the dam, in 1861, until the commencement of the suit, in 1867. It was insisted by the appellees that they had erected a dam in accordance with the act of congress, and that the lands in question had not been taken or appropriated. Upon this contention the court, in rendering the decision on appeal, announced, 13 Wall. 176: "We are of the opinion that the statute did not authorize the erection of a dam which would raise the water of the lake above the ordinary level."

With reference to the contention of the appellees, that there was no constitutional taking of the appellant's land, and that the damage was a consequential result of such use of a navigable stream as the government had a right to make for the improvement of its navigation, the court said:

"It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that sub-

ject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for the invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors."

In the United States v. Lynah, 188 U.S. 445, 485, 23 S.Ct. 349, 47 L.Ed. 539, a dam had been constructed by the United States in such manner as to hinder the natural flow of a stream and, as a necessary result, to raise the level of its waters and overflow the land of plaintiff to such an extent as to cause a total destruction of its value. It was impossible to remove this overflow of water and the property, in consequence, had become an irreclaimable bog, unfit for any agricultural use. It was held that the property had been taken and that the Government was liable for just compensation, upon payment of which the title and right of possession would pass.

In United States v. Cress, 243 U.S. 316, 332, 37 S.Ct. 380, 61 L.Ed. 746, the government by means of a lock and dam had raised the water of the Cumberland river above its natural level, so that lands not normally invaded were subjected permanently to frequent overflows, impairing them to the extent of one-half their value. A like improvement had raised the waters of the Kentucky river in the same manner so as to end the usefulness of a mill by destroying the head of water necessary to run it. The findings made it plain that it was not a case of temporary overflow or of consequential injury but a condition of "permanent liability to intermittent but inevitably recurring overflows" and it was held that such overflowing was a direct invasion, amounting to a taking.

Treating the allegations of the petition as true, as we must on demurrer, the case at bar clearly falls within the legal principles of the foregoing cases.

If the land of a riparian owner above ordinary high water mark may be permanently overflowed while improving navigation and he is thereby deprived of its beneficial use and enjoyment without compensation, it follows that on the same principle his land could be equally used for the erection of a dam upon it, one being as destructive as the other. It is a transparent fallacy to say that a citizen's land is not taken when water so often overflows it as to deprive him of its use though he still retains its worthless title. The flowage of land against the owner's consent and without compensation is a taking of his property under the Fifth Amendment. Manigault v. Springs, 199 U.S. 473, 484, 26 S.Ct. 127, 50 L.Ed. 274; Jacobs v. United States, 290 U. S. 13, 18, 54 S.Ct. 26, 78 L.Ed. 142, 96 A.L.R. 1. Where it is thus appropriated under congressional authority, there is an implied promise on the part of the United States to pay the owner its reasonable value. Hurley v. Kincaid, 285 U.S. 95, 104, 52 S.Ct. 267, 76 L.Ed. 637.

In all states bordering on the Mississippi, there is an implied power in the Legislature and a fortiori in the Congress to take all the land adjacent to the river to the ordinary high water mark for the purposes of navigation and as an incident to that purpose to control floods but it does not follow from this that there is any power outside of and apart from the right of eminent domain to lawfully by direct or implied legislation take any private property above the ordinary high water mark or take the use of it or so damage it as to deprive the owner of it without compensation. Yates v. Milwaukee, 10 Wall. 497, 77 U.S. 497, 507, 19 L. Ed. 984.

It has been long recognized that property is owned under an implied limitation and must yield to the necessities of transportation and commerce but obviously the implied limitation is restricted, otherwise the Fifth Amendment is gone. One fact for consideration in determining such limits is the extent of the diminution and when it reaches such magnitude that the use of the property is destroyed, there must be an exercise of eminent domain and compensation to sustain the taking. Panhandle Eastern Pipe Line Company v. State Highway Commission, 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090.

The invasion of the appellants' land by the diversion of the current of the stream cannot be justified on the ground that the

469

damages were "consequential." This phrase as applied to eminent domain has acquired a broad meaning by which judges are sometimes misled. In judicial proceedings, it should be used intelligently and with due regard to its proper meaning, which is losses or injuries which follow an act, but are not direct and immediate upon it.

Here the injuries of which the appellants complain were the direct result of the construction of the dike. While it is alleged that the river did not destroy all of the land until the lapse of twelve months, its ravages were continuous. The phrase "immediate and consequential" should be understood, not in reference to the time which the act occupies, or the space through which it passes or the place from which it began, but in reference to its uninterrupted progress and termination. If the injury is inflicted by the act at its inception and continues to its termination, it is direct, but if it arises after the act has been completed, though occasioned by it, it is consequential. Thus, if one digs a ditch which diverts a stream of water onto his neighbor's land or makes a dam across the stream which obstructs or checks its current and throws the water back upon complainant's land, there is an immediate injury from the obstruction.

The United States lays no claim to the title of the land in controversy and the appellants allege that it was impracticable and economically impossible to construct levees on their lands to protect them from the changed current of the river caused by the construction of the dikes by the appellee. I am of the opinion the appellants stated a good cause of action in their respective petitions for an unlawful taking of property under the Fifth Amendment and the lower court erred in sustaining the demurrers and the judgment should be reversed.